**FEDERAL DEPOSIT INSURANCE CORPORATION, as successor to Resolution Trust Corporation, Receiver of United Savings Bank, F.S.B., Plaintiff,**

v.

**Donald J. MOSKOWITZ, et al., Defendants.**

**Civil Action No. 93–2028.**

United States District Court, D. New Jersey.

Dec. 2, 1996.

See also 868 F.Supp. 634.

Susan L. Hall, Daniel Kinburn, Dwyer, Kinburn & Hall, Totowa, NJ, for Plaintiff Federal Deposit Insurance Corp.

James M. Mulvaney, Robert J. McGuire, McElroy, Deutsch & Mulvaney, Morristown, NJ, for Defendant Fidelity & Deposit Company of Maryland.

## OPINION

WOLIN, District Judge.

This matter comes before the Court on the motion of Fidelity & Deposit Company of Maryland ("F & D"). Pursuant to Federal Rule of Civil Procedure 56, F & D moves for summary judgment on the claims brought against it by the Resolution Trust Corporation (the "RTC"), in its capacity as Receiver of United Savings Bank, F.S.B. ("United"). The Federal Deposit Insurance Corporation (the "FDIC") succeeded to the RTC and

opposes this motion. The Court decides this motion on the parties' written submissions pursuant to Federal Rule of Civil Procedure 78. For the reasons expressed herein, F & D's motion for summary judgment will be granted.

## BACKGROUND

History teaches that war comprises many battles; complex civil litigation is no different. In this case, when in May 1990 the Office of Thrift Supervision declared United insolvent and appointed the RTC as United's receiver,[1] war became inevitable. Indeed, the RTC first attacked on May 14, 1993, when after three years of investigating the cause of United's demise, the RTC filed a complaint against thirty-five defendants including certain of United's former officers, directors, appraisers, accountants, lawyers, borrowers and, most importantly here, United's fidelity bond carrier, F & D. Since 1993, the three dozen parties have waged a myriad of battles with varying results; some parties settled, others had defaults entered against them, and still others remain engaged with the FDIC.

On the eve of trial, several of the nine remaining defendants have initiated final charges against the FDIC in the form of motions for summary judgment. F & D is one such defendant.

As against F & D, the FDIC claims that United's losses resulted from the fraud and dishonesty of its employees and that those losses are covered by the Financial Institution Bond issued by F & D to United on May 18, 1989 (the "1989 Bond").[2] Pursuant to the 1989 Bond, F & D agreed to indemnify United for losses resulting directly from dishonest or fraudulent acts committed by an employee so long as such acts were committed with the manifest intent (a) to cause United to sustain such losses and (b) to obtain financial benefit for the employee or other person or entity. Lombardi Aff. Ex. 1 at 2. The 1989 Bond provided coverage for losses discovered during the period of time between February 17, 1989 and February 17, 1990.[3]

It is undisputed that United employees committed fraudulent acts which, to some extent, contributed to United's losses.[4] In fact, United's President, Donald Moskowitz ("Moskowitz"), and United's Controller were found guilty of criminal activity and were sentenced accordingly.

F & D, however, refused recovery on the 1989 Bond. Thus, as part of its initial complaint in May 1993, the RTC sued F & D for breach of contract. F & D filed a counterclaim seeking rescission of the 1989 Bond on the grounds that, inter alia, United fraudulently induced F & D to issue the 1989 Bond by misrepresenting material information in the 1989 Bond application. On this same basis, F & D argues that it is entitled to summary judgment. In addition, F & D contends that summary judgment is appropriate because a reasonable finder of fact could not conclude that United discovered

---

1. The RTC was appointed receiver of United pursuant to the Financial Institution's Reform, Recovery and Enforcement Act of 1989.

2. The 1989 Bond indemnifies United for qualified losses up to $2.5 million with a deductible of $25,000. The 1989 Bond has been the subject of three prior opinions of the Court. *RTC v. Moskowitz*, 845 F.Supp. 247 (D.N.J.1994) (holding that the RTC could not recover under the 1989 Bond because the RTC was not the insured) ("RTC 1"); *RTC v. Moskowitz*, 1994 WL 475811 (D.N.J.1994) (granting RTC's motion for reconsideration of RTC 1 and holding that RTC could recover under the 1989 Bond; stating that whether United discovered the loss before the 1989 Bond expired is a triable issue; and granting F & D's motion for summary judgment on the basis that the 1989 Bond is a claims-made policy and that submission of proof of loss was untimely) ("RTC 2"); *RTC v. Moskowitz*, 868

F.Supp. 634 (D.N.J.1994) (granting RTC's motion for reconsideration; finding that, under New Jersey law, the 1989 Bond is a discovery policy, not a claims-made policy; and vacating grant of summary judgment in RTC 2) ("RTC 3").

3. United was required by statute to maintain fidelity insurance at all times. For the twelve-month period prior to the period covered by the 1989 Bond, F & D had also issued a financial institution bond in favor of United (the "1988 Bond").

4. The extent to which each defendant caused United's losses, if at all, is an issue to be resolved at trial. The Court is comfortable, however, in stating that United employees contributed to United's losses. The Court expresses no opinion or conclusion as to the cause of United's losses.

the losses during the 1989 Bond period. As discussed more fully below, the Court agrees with the former argument and disagrees with the latter.

### 1. Facts Relevant to F & D's Misrepresentation Claim

On or about December 20, 1988, United submitted a bond application to F & D. The application was submitted to F & D through Norman Koch ("Koch") who, at that time, was a member of United's Board of Directors and also United's insurance broker. McGuire Certif. Ex. 1 at 185–1 to 23, 171–5, 226–15 to 227–7. The 1989 Bond application contained the following question 13:

13. Date of last examination by State authorities?

Date of last examination by Federal authorities?

Was there any criticism of your operations in either the last State or Federal examination?

If "Yes", explain.

In response to the first two parts of question 13, United averred that the dates of the last examination by both state and federal regulators was "9/19/88 to 10/27/88." United answered the third part of question 13 in the negative. Lombardi Aff. Ex. 5 at 4.

The 1989 Bond application also contained the following statement above the signature line:

The Insured represents that the information furnished in this application is complete, true and correct. Any misrepresentation, omission, concealment or incorrect statement of a material fact, in this application or otherwise, shall be grounds for rescission of any bond issued in reliance upon such information.

*Id.*

The 1989 Bond contains the following language:

D. The insured represents that the information furnished in the application for this bond is complete, true and correct. Such application constitutes part of this bond.

Any misrepresentation, omission, concealment or any incorrect statement of a material fact in the application or otherwise shall be grounds for rescission of this bond.

Lombardi Aff. Ex. 1 at 67000105 (Bates No.).

F & D contends that United falsely represented that there had been no criticisms by the regulators. In support of its position, F & D submits the joint report produced by the state and federal regulators after their examination of United in September and October of 1988 (the "1988 Report"), the examination to which United referred in its response to question 13. McGuire Certif. Ex. 8. A "Report Summary" begins on page one of the 1988 Report. The summary states, in relevant part:

On September 19, 1988, a joint regular examination of [United] commenced, with federal and state of New Jersey examiners participating. Minimum scope programs were followed in the major areas of review: commercial real estate lending, financial analysis, and regulatory compliance. However, due to unsatisfactory findings in the area of investments, particularly internal control/accounting procedures for investment activity, expanded review was conducted focusing on internal controls in this area.

... [M]atters of policies and procedures, management expertise, recordkeeping, asset quality and reports to the board of directors have become a matter of examination concern. The following matters are brought to the attention of the directors for their review and consideration....

1. *Management*

... Documented director oversight, particularly in the areas of investments and loan analysis/review, appears lacking and is noted in the examination report....

2. *Investment Activity*

... [D]ocumented internal control weaknesses indicate [securities and options trading] activity to be potentially unsafe and unsound. During the course of the examination, a Supervisory Directive was issued, outlining areas of concern. It is imperative that the board of directors review the directive and comments in the

examination report, and take the necessary action to correct the internal control deficiencies.

### 3. Criticized Assets

... It is essential that the board direct attention to [certain loans presented in this report], to prevent further deterioration with a resultant negative impact on operations and possible erosion of capital.

### 4. Operations

... [T]he association's profitability remains exposed to interest rate risk, the potential impact of classified assets and the Supervisory Directives concerning lending and investments. It is recommended that the board give prompt remedial attention to these areas to insure continued profitability....

### 5. Risk Management

United's interest rate risk policy does not address a specific strategy to improve its asset/liability maturity gap position....

### 6. Internal Loan Review

As of report date the association has not established a committee for loan review and classification of assets, as required by Insurance Regulation 561.16c(c)(2). It is necessary for the board to implement a working asset classification procedure to insure early detection of problem assets and possible establishment of adequate reserves.

### 7. Appraisals

Deficiencies were noted during the examination concerning support of values and feasibility studies on updated appraisals for large commercial/construction real estate projects....

*Id.* at 1–2.

With respect to investment activity, the body of the 1988 Report states, inter alia, that "it appears that neither management nor the board of directors has the technical expertise necessary to guide and monitor the sophisticated investment activity." *Id.* at 4. Further, "[t]he inability of management to properly account for such transactions and the failure of [the] board to adequately monitor this activity is potentially an unsafe and unsound practice, and has already become a matter of supervisory concern." *Id.*

As to minutes of the board of directors meetings, the 1988 Report indicates that "[t]he minutes are silent as to loan discussion" and that "[t]his deficiency was noted in the previous examination report." *Id.* at 5.

The 1988 Report describes the internal controls of securities trading as potentially unsafe and unsound. *Id.* at 6. "As criticized in the previous examination report, and also by the independent auditor, a commitment register, as required by Insurance Regulation 563.17–5(f)(1), was not available for review. This is in direct contradiction of a letter to the FHLBB–NY's District Accountant ... from President Moskowitz [which states] 'we have created a permanent register.'" *Id.* at 7. The 1988 Report goes on to identify three occasions on which United's investment policy was violated. One of such occasions "reflects many internal control weaknesses." *Id.* at 8. Again, the examiners stated that "the association's personnel do not have thorough knowledge or expertise in the nature of and accounting for investment instruments the association is trading." *Id.*

With respect to appraisals, the 1988 Report concludes that updated appraisals on existing projects that were conducted in response to the prior examination contained "several of the same deficiencies that were noted in the previous examination report.... The appraisals reviewed lacked feasibility studies to determine market demand for the projects." *Id.* at 9–10.[5]

The 1988 Report also contains United's responses to the regulators' review. In its responses, United states that, with respect to security trading, it "will accept the criticism as [it] stands and endeavor to improve [its] recordkeeping faculties." *Id.* at 18. As to the classification of certain option investments, United states that "we accept the

---

**5.** On pages 11–17 of the 1988 Report, the regulators recapitulate additional conclusions from their 1988 review of United. Without belaboring the point or repeating many of the comments quoted supra, the regulators described various areas of investigation in a similar tone as that set forth above.

above criticism with the above qualification, as stands, and will not repeat this violation in the future." *Id.* at 19. United also acknowledges "appraisal deficiencies." *Id.* at 22.

United, however, takes issue with the regulators' conclusion that United's policies are potentially unsafe and unsound. United also asks that the regulators take into account the historical soundness and positive financial results that United has experienced. *Id.* at 21.

As to question 13, the FDIC argues that whether the regulators "criticized" United's "operations" is ambiguous and that such ambiguity must be construed in favor of the insured. The FDIC contends that whether the regulators' comments in the 1988 Report constitute "criticisms" is for a jury to decide. Pl.'s Br. in Opp. at 8, 18. Moreover, the FDIC posits that part of the 1988 Report relates to operating results and that United could have construed the question regarding "operations" as limited to this section. The FDIC argues that United's operating results were not criticized; thus, the FDIC asserts that United answered the application question truthfully or, at the very least, United did not knowingly answer the questions falsely.

As additional support for its position that United made material misrepresentations that warrant rescission of the 1989 Bond, F & D asserts that United failed to disclose the two Supervisory Directives referenced in the 1988 Report.[6] One of the Supervisory Directives was issued by the Federal Home Loan Bank Board (the "FHLBB") to United on September 16, 1987. Through this directive, the FHLBB directed United to "immediately cease [commercial and residential development real estate mortgage] lending until we give specific written approval for its resumption."[7] McGuire Certif. Ex. 2 at 1. United's Board of Directors acknowledged being advised of the directive at their Sep-

tember 28, 1987 meeting. *Id.* Ex. 4. Koch admitted that he was aware of the directive in September 1987 and that he regarded the directive as a serious criticism of United's operations. *Id.* Ex. 1 at 84–4 to 17. As of the date the 1989 Bond was issued, the FHLBB had not lifted the Supervisory Directive.

Joyce Lombardi ("Lombardi"), an underwriter for F & D during the period relevant here, states that by letter dated February 14, 1989, she informed Koch that F & D may "have no alternative but to decline to write the 1989 Bond for United because United's classified loans were too high, its classified loans to capital ratio was poor, its net income was negative, it had excessive past-due loans, and its FASB net-worth-to-liabilities ratio was too low." Lombardi Aff. ¶ 8 and Ex. 7. F & D sent similar letters to Koch on April 3, 1989 and May 4, 1989. *Id.* ¶ 10 and Ex. 9. The latter letter asked: "Is the Bank operating under any type of Supervisory Agreement?" On May 16, 1989, during a telephone conversation, Koch informed Lombardi that United was not operating under any supervisory agreements. *Id.* ¶ 13 and Ex. 11. F & D issued the 1989 Bond on May 18, 1989.

Lombardi avers that "[i]t was only after receiving written and oral assurances from Koch and [Moskowitz] that F & D ultimately agreed to issue the 1989 Bond.... Had F & D known of the 1987 FHLBB directive or of the numerous criticisms of the regulators in the [1988 Report], F & D definitely would not have issued United's bond for 1989." *Id.* ¶ 14 and 15.

### 2. Facts Relevant to F & D's Discovery Claim

Section 3 of the 1989 Bond states that coverage only "applies to loss discovered by [United] during the bond period." Lombardi

---

**6.** In further support, F & D also relates in detail certain alleged misrepresentations made by United with respect to the 1988 Bond application. Specifically, F & D discusses two questions from the 1988 Bond application which F & D contends United answered falsely. The Court fails to see the relevance that the 1988 Bond application would have in an argument for rescission of the 1989 Bond. As such, the Court will not restate

or consider the facts provided by F & D that relate solely to the 1988 Bond application.

**7.** The other Supervisory Directive was issued by the FHLBB on October 21, 1988 and prohibited United from purchasing securities other than short-term liquid assets. Hall Aff.Ex. C at 11000218 (Bates No.). This directive is not addressed by the parties.

Aff. Ex. 1 at 67000107 (Bates No.). The 1989 Bond period expired February 17, 1990. Under the bond, discovery occurs:

> when the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of the loss may not be known.

*Id.* at 67000107–08 (Bates No.).

F & D argues that it is entitled to summary judgement because no reasonable person could conclude that United discovered the losses during the term of the 1989 Bond.

The FDIC claims that there may have been discovery within the bond period by William Marotta ("Marotta"), Michael Lerner ("Lerner"), Lerner's law firm—Crummy, Del Deo, Dolan, Griffinger & Vecchione ("Crummy, Del Deo") or United's Board of Directors.

The undisputed facts indicate that Marotta, who was a Vice President at United in December 1989, was present when federal agents read Moskowitz his Miranda rights and told Moskowitz that he was the target of an investigation relating to Arnold Gordon Enterprises ("AGE"), a vendor to United. In essence, the agents were investigating a fraud scheme through which Moskowitz allegedly received personal benefits from AGE in exchange for Moskowitz authorizing payments for supplies that were never delivered to United. At his deposition, Marotta testified that, as of December 1989, he had knowledge of the alleged kickbacks. McGuire Certif. Ex. 9 at 162. He was aware that Moskowitz was defending against the allegations and responding to subpoenas, but Marotta stated that the allegations were not confirmed until after April 1990. *Id.*

Lerner became aware of the allegations in late December 1989 when Moskowitz met with Lerner, told him of the investigation and asked him to recommend an attorney to help Moskowitz defend the allegations. Lerner contacted a partner at Crummy, Del Deo who recommended an attorney for Moskowitz. At that time, Crummy, Del Deo repre-

sented United in various banking matters. The next day, Lerner met with several partners at Crummy, Del Deo to discuss the investigation and any potential conflict of interest. Crummy, Del Deo concluded that it did not represent United in the corporate context.

Moskowitz informed the Board of Directors of the investigation on January 17, 1990. Hall Aff. Ex. E. At that meeting, Moskowitz gave the Board the following information: the investigation involved AGE; the head of AGE had pled guilty to fraud in November 1989; federal agents were scrutinizing the conduct of United and Moskowitz; bank records had been subpoenaed; and Moskowitz had obtained personal counsel. *Id.* Moskowitz also assured the Board that he was innocent, but that per the advice of his attorney, he would not discuss the matter in detail. *Id.* Finally, at that meeting, the Board approved the hiring of an attorney to handle the AGE subpoenas as well as other federal subpoenas that had been served on United in connection with certain transactions between United and borrowers. *Id.* Several Board members have testified to knowledge of the allegations and subpoenas as of January 1990. McGuire Certif. Ex. 1 at 95; Ex. 10 at 121.

**DISCUSSION**

**1. Standard for Summary Judgment**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the burden of demonstrating that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In making this determination, the Court must draw all reasonable inferences in favor of the non-movant. *National State Bank v. Federal Reserve Bank of New York*, 979 F.2d 1579, 1581 (3d Cir.1992).

If the moving party has sustained its burden, the burden shifts to the non-moving party to demonstrate to the Court that sufficient evidence exists from which a jury might return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610 (3rd Cir.1987) (Becker, J., concurring). The non-movant may not "rest upon mere allegations, general denials," or "vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.), *cert. denied*, 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990) ("unsupported allegations in [a non-movant's] memorandum and pleadings are insufficient to repel summary judgment"); *see* Fed.R.Civ.P. 56(e). If the non-movant's evidence is merely "colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

## 2. Misrepresentation

New Jersey law generally provides that, "a misrepresentation by the insured, whether contained in the policy itself or in the application for insurance, will support a forfeiture of the insured's rights under the policy if it is untruthful, material to the particular risk assumed by the insurer, and reasonably relied upon by the insurer issuing the policy." *Williams v. American Home Assurance Co.*, 121 N.J.Super. 351, 361, 297 A.2d 193 (App.Div.1972) (automobile insurance), *certif. denied*, 62 N.J. 260, 300 A.2d 344 (1973). New Jersey statutory law authorizes an insurer to deny recovery for misrepresentations made on an application for insurance if such misrepresentations "materially affected either the acceptance of the risk or the hazard assumed by the insurer." N.J.S.A. 17B:24–3(d) (1985). In interpreting that section, the New Jersey Supreme Court has stated that "to rescind a policy, an insurer need not show that the insured actually intended to deceive." *Ledley v. William Penn Life Ins. Co.*, 138 N.J. 627, 635, 651 A.2d 92 (1995) (citing *Massachusetts Mut. Life Ins. Co. v. Manzo*, 122 N.J. 104, 114, 584 A.2d 190 (1991)). Rather, "[e]ven an innocent misrepresentation can constitute equitable fraud justifying rescission." *Id.* (citing *Metropolitan Life Ins. Co. v. Tarnowski*, 130 N.J.Eq. 1, 3–4, 20 A.2d 421 (E. & A. 1941)).

"Equitable fraud, however, distinguishes between subjective and objective questions on the application." *Id.* at 635–36, 651 A.2d 92 (citations omitted). Objective questions seek information within the applicant's knowledge, "such as whether the applicant has been examined or treated by a physician." *Formosa v. Equitable Life Assurance Soc'y*, 166 N.J.Super. 8, 15, 398 A.2d 1301 (App.Div.), *certif. denied*, 81 N.J. 53, 404 A.2d 1153 (1979). Subjective questions "seek to probe the applicant's state of mind" and are concerned with more ambiguous issues, such as "what is the state of the applicant's health or whether the applicant has or has had a specified disease or illness." *Id.* Answers to subjective questions do not constitute equitable fraud if "the question is directed toward probing the knowledge of the applicant and determining the state of his mind and ... the answer is a correct statement of the applicant's knowledge and belief...." *Ettelson v. Metropolitan Life Ins. Co.*, 164 F.2d 660, 665 (3d Cir.1947).

The question at issue in the 1989 Bond application is whether there had been any "criticism" of "operations" by state and federal regulators in their last examination. The FDIC contends that "[o]ne person's concept of what constitutes 'criticism of operations' may differ from another's on two levels. First, whether there was a criticism at all, and second, whether the criticism was directed at operations in a limited sense (i.e. the limited section of the report of examination captioned 'Operating Results') or in some other larger sense." Pl.'s Br. in Opp. at 21. The FDIC submits that the terms at issue are ambiguous and that the question is, therefore, subjective.

The Court agrees that what constitutes a criticism is a subjective determination; different concepts of what constitutes criticism may exist. For example, if a teacher simply informs a student that his algebraic skills "need improvement," the comment may be

interpreted by the student as a criticism or merely an observation. In response to a question from his parents as to whether the teacher has ever criticized the student's math skills, the student may honestly answer yes or no. The teacher's single comment cannot objectively be labeled a criticism.

Under certain circumstances, however, a response to a subjective question may be objectively false. To continue with the example, if the teacher has an in depth conversation with the student to review the student's work in each area of study, and during the conversation the teacher repeatedly informs the student that his work product is deficient and unsound, that he should take remedial action and that he lacks acceptable knowledge of certain subjects, the student could only answer his parents' question truthfully if he were to acknowledge that the teacher's comments were criticisms. The extent and detail of the teacher's comments renders any other response objectively false.

Here, the FDIC contends that whether the 1988 Report criticized United is an issue of fact. The Court, however, finds the 1988 Report rift with criticism. As quoted above, the report refers to deficiencies, unsafe and unsound practices, unacceptable levels of knowledge and expertise, and the need for remedial attention. The 1988 Report also refers to the Supervisory Directive issued in 1987 that directed United to cease certain lending. The Court concludes that only one reasonable conclusion may be drawn from a fair reading of the 1988 Report—the regulators criticized United.[8]

The Court is similarly unpersuaded by the FDIC with respect to the meaning of "operations." The FDIC argues that United may have interpreted the term operations to include only the portion of the 1988 Report relating to Operating Results. The 1988 Report includes sections with the following captions: Report Summary, Management, Asset Quality, Capital, Risk Management, Operating Results and Miscellaneous. Upon review of the 1988 Report, the Court concludes that,

in the context of the application and the 1988 Report, a general question about "operations" could not reasonably be interpreted as limited to the Operating Results section.

Consequently, giving the FDIC the benefit of all favorable inferences, the Court concludes that United could not have believed that there had been no criticisms of operations by the state and federal regulators; the response to question 13 was false.

New Jersey law, however, provides that the doctrine of equitable fraud is not strictly applied to all representations by an insured. *See, e.g., Ettelson,* 164 F.2d at 665. Strict application of the equitable fraud doctrine only applies to objective questions. With respect to subjective questions, "an insurer must demonstrate not only that an answer was false, but also that the insured knew that it was false." *Fidelity & Deposit Co. of Maryland v. Hudson United Bank,* 653 F.2d 766, 773 (3d Cir.1981).

The FDIC argues that United's representations in the 1989 Bond application could not have been knowingly false at the time the application was completed in December 1988 because United did not receive the 1988 Report (and purportedly was not aware of the regulators' comments) until April 4, 1989. Pl.'s Br. in Opp. at 7, 18. The FDIC contends that "[w]ith regard to F & D's misrepresentation theory, it is apparent that United had not yet received the 1988 exam when it provided a negative answer to the question regarding regulatory criticism—putting to rest any question of misrepresentation." *Id.* at 18.

The facts, however, indicate otherwise. That United filed responses to the regulators' comments and that these responses were included in the 1988 Report belies the FDIC's argument that it was unaware of the criticisms until April 1989. Indeed, there is evidence that the regulators issued an interim report dated October 11, 1988, well before the date United filed the application. Hall Aff. Ex. C at 11000218 (Bates No.). Moreover, at the time United completed the appli-

---

8. The Court notes that in the various pleadings and papers filed in respect to other motions in this case, the FDIC has often referred to the fact that regulators criticized and admonished Unit-

ed. *See, e.g.,* First Am. Compl. ¶¶ 49, 78, 90; McGuire Supplemental Certif.Ex. A at 7–8 (Pl.'s Br. in Opp. to B.K. Appraisal Services' Motion for Summary Judgment).

cation, it was operating pursuant to two FHLBB Supervisory Directives which embodied certain criticisms of the regulators. One Supervisory Directive restricting trading was issued to United by the FHLBB during the 1988 examination. Hall Aff. Ex. C at 11000218 (Bates No.). Additionally, it is undisputed that United was aware that it had been subject to the other Supervisory Directive since September 1987 and that the directive limited United's lending ability. The Board was made aware of this directive in September 1987; to wit, Koch admitted that he was aware in September 1987 of the FHLBB directive prohibiting commercial loans and that he regarded the directive as a serious criticism of United's operations. McGuire Certif. Ex. 1 at 84–4 to 14. Based on the record, the Court concludes that United was aware of existing criticisms at the time it completed and filed the 1989 Bond application.

The Court notes, however, that even if United did not have knowledge of the 1988 Report until April 1989, the facts still indicate that United knowingly misrepresented application information to F & D. It is undisputed that F & D did not issue the 1989 Bond until May 18, 1989. "It is well settled that, where an application for insurance has been submitted to an insurer and, before the policy is issued, a change of conditions material to the risk occurs or is discovered by the applicant, he is under an obligation to inform the insurer promptly. The knowing suppression or failure to make timely disclosure of such information constitutes a material misrepresentation." *Weir v. City Title Ins. Co.,* 125 N.J.Super. 23, 29, 308 A.2d 357 (App.Div. 1973). The facts demonstrate that during the period after United filed the application and before F & D issued the Bond, United indisputably became aware of the 1988 Report. At the very least, United became aware of the regulators' criticisms while the 1989 Bond application was pending, and the criticisms would have caused United's initial

response to be untrue. United was therefore under a duty to disclose the regulators' criticisms so as to correct the information previously provided in the application.[9] The failure to supplement incorrect information in the application constitutes a misrepresentation, *id.,* and would support rescission of the 1989 Bond. *See Hudson United Bank,* 653 F.2d at 773.

Finally, in order to award the equitable relief of rescission on the basis of a misrepresentation in the application for insurance, New Jersey law provides that the misrepresentation must be material. N.J.S.A. 17B:24–3(d); *Massachusetts Mut. Life Ins. Co. v. Manzo,* 122 N.J. 104, 115, 584 A.2d 190 (1991). The New Jersey Supreme Court has held that "[a] misrepresentation is material if it 'naturally and reasonably influence[s] the judgement of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium.'" *Ledley,* 138 N.J. at 638, 651 A.2d at 97 (citing *Manzo,* 122 N.J. at 115, 584 A.2d 190).

United falsely answered "no" in response to question 13 of the 1989 Bond application. Lombardi, an underwriter for F & D during the time relevant here, testified that "[h]ad F & D known of the 1987 FHLBB directive or of the numerous criticisms of the regulators in the [1988 Report], F & D definitely would not have issued United's bond for 1989." Lombardi Aff. ¶ 15. Lombardi further stated: "One question on [the application] was a key question about any criticisms by any regulators. If that were answered yes, we would go back to determine what those criticisms were." McGuire Certif.Ex. 7 at 12–25 to 13–3. In essence, Lombardi testified to the materiality of question 13 and F & D's reliance thereon. Lombardi's testimony is supported by the fact that the application had a total of sixteen questions, many of which merely sought biographical information about United or the type of coverage desired. The number and substance of the

---

9. The Court further notes that while the application was pending, F & D requested additional assurances from United that it was financially sound and not subject to any supervisory agreements. *See, e.g.,* Lombardi Aff.Ex. 10 at 2. Koch expressly denied that United was working under

any supervisory agreement despite the fact that Supervisory Directives had been issued by the FHLBB in the fall of 1987 and 1988. *Id.* ¶ 13 and Ex. 11. Those directives were still in effect as of May 1989.

questions in the application supports a finding of materiality.[10] Also, simple logic contributes to the conclusion that the question is material. Evidence that bank regulators had criticized a bank's operations would be relevant to the determination of whether to issue fidelity insurance to the bank; an affirmative response to question 13 would have triggered an investigation by F & D as to why such criticisms had been leveled at United. *See* McGuire Certif.Ex. 7 at 12–25 to 13–3; *Ledley,* 138 N.J. at 639, 651 A.2d at 97. Finally, the Court notes that the FDIC offers no specific facts in rebuttal to F & D's proposition that question 13 is material. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the basis of the foregoing, the Court concludes that question 13 is material; United's false response to question 13 reasonably influenced the judgment of the underwriter in making the contract. *See Manzo,* 122 N.J. at 115, 584 A.2d 190.

The Court recognizes that rescission is a drastic remedy. The facts, however, demonstrate that United knowingly and falsely denied that the regulators had not criticized operations. Even viewing the facts in a light most favorable to the FDIC, the Court is convinced that United concealed information that would have materially affected F & D's decision as to whether to issue the 1989 Bond. F & D may therefore rescind the policy because of United's equitable fraud. *Hudson United Bank,* 653 F.2d at 773; *Ledley,* 138 N.J. at 638–39, 651 A.2d at 97.

**3. Discovery**

 The Third Circuit has stated that "discovery" does not occur until "a bank has sufficient knowledge of specific dishonest acts to justify a careful and prudent person in charging another with dishonesty or fraud." *Hudson United Bank,* 653 F.2d at 775. Suspicion is not sufficient discovery. Under the 1989 Bond, discovery occurs when

the insured becomes aware of facts that would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred. Lombardi Aff.Ex. 1 at 67000107–08 (Bates No.).

More than two years ago, F & D moved to dismiss on the basis that discovery by United did not occur during the bond period. In opposition, the RTC filed the affidavit of Marotta and the minutes from the Board meeting at which Moskowitz informed the Board of the allegations and subpoenas. The Court denied F & D's motion stating:

> What Marotta and the Board knew (and when each knew it) are genuine issues of material fact. By submitting the Marotta affidavit and the Board's minutes, the RTC has raised questions concerning the underlying facts each had that cannot be resolved via summary judgment.

*Resolution Trust Corp. v. Moskowitz,* No. 93–2080, 1994 WL 475811, *5 (D.N.J.1994). The Court did not address whether Lerner or Crummy, Del Deo had discovered losses under the 1989 Bond. *Id.* at *8 n. 1.

Here, the FDIC again submits the Marotta affidavit and the Board minutes. In an attempt to escape the Court's previous holding, F & D argues that discovery has been completed and that depositions of the relevant parties demonstrate precisely what the parties knew and when they knew it. Def.'s Br. at 18. On the basis of these depositions, F & D asserts that no factual issue exists and that summary judgment is proper.

Despite F & D's persistence, the Court cannot conclude as a matter of law that Marotta's and the Board's knowledge of the AGE scheme constitute discovery under the 1989 Bond. Resolving all inferences in favor of the FDIC, it is possible to conclude that, knowing that Moskowitz was accused of accepting kickbacks, Marotta or the Board could have assumed that a loss covered by the 1989 Bond had been or would be in-

---

10. The facts indicate that F & D eliminated from the 1989 Bond application a question that appeared on the 1988 Bond application. The FDIC argues that F & D's decision to delete the question from the 1989 application demonstrates that the information sought by the question in the 1988 application is immaterial. In essence, the FDIC contends that the deletion (or absence) of the question indicates that the question was immaterial. The contrapositive to this argument is that the presence of a question contributes to the conclusion that the information sought by the question is material.

curred. The Court acknowledges that the newly-submitted deposition testimony of Marotta and certain Board members undercuts, to some extent, the FDIC's position that discovery occurred. Such testimony does not, however, preclude a reasonable finding that discovery occurred.

In light of the Court's decision to grant summary judgment on the misrepresentation issue, the Court will not delve into a thorough discussion of the discovery issue. It is sufficient that colorable material issues of fact exist as to whether Marotta or the Board "discovered" the losses during the bond period.[11]

## CONCLUSION

For the reasons expressed above, the Court will grant F & D's motion for summary judgment based on the doctrine of equitable fraud.[12] F & D will be permitted to rescind the 1989 Bond. The battle between the FDIC and F & D has thus ended. For F & D, the end of the battle signals the end of the war. For the FDIC, this is simply the end of the war with respect to one more defendant.

An appropriate order is attached.

## *ORDER*

In accordance with the Court's Opinion filed herewith,

It is on this 2d day of December, 1996

ORDERED that defendant Fidelity & Deposit Company of Maryland's (F & D) motion for summary judgment based on the doctrine of equitable fraud is granted; and it is further

ORDERED that F & D is permitted to rescind the 1989 Bond.

---

**11.** The Court does not express an opinion as to whether Lerner was an "employee" of United within the meaning of the 1989 Bond or whether he or Crummy, Del Deo discovered losses.

**12.** The Court does not address F & D's argument that United's response to question 13 constitutes a breach of warranty and that such breach provides a basis to rescind the 1989 Bond.