767 A.2d 515 (2001)
337 N.J. Super. 447
Scott LIEBLING, Plaintiff-Appellant,
v.
GARDEN STATE INDEMNITY, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued January 24, 2001.
Decided March 1, 2001.
*516 Bruce A. Wallace, III, Cherry Hill, for appellant (Wallace, Legome & Pietras, attorneys; Steven S. Maletzky, on the brief).
Andrew L. Indeck, Bedminster, for respondent (Scarinci & Hollenbeck, attorneys; Mr. Indeck, of counsel; Mr. Indeck and Kathleen J. Devlin, on the brief).
Before Judges KING, COBURN and LANDAU.
The opinion of the court was delivered by COBURN, J.A.D.
Defendant, Garden State Indemnity Company ("Garden State"), issued a claims-made malpractice insurance policy to plaintiff, Scott Liebling, an attorney. When Liebling was sued by a former client for conduct occurring before he applied for the policy, Garden State denied coverage. Liebling filed an action for declaratory judgment. Garden State answered, asserting equitable fraud as an affirmative defense, and demanding rescission of the policy. Its primary allegation was that one of Liebling's answers to a subjective question posed in the insurance application was a material misrepresentation. Both *517 sides filed motions for summary judgment. Garden State prevailed on the ground that although the question was subjective, the answer was false. Garden State had argued that the answer was false in the sense that no reasonable attorney would have so replied based on the facts known to the applicant. The judge's ruling was ambiguous: either he agreed with Garden State or he ruled for Garden State on the ground that Liebling had made a knowingly false misrepresentation. Liebling appeals, arguing that summary judgment was inappropriate because his answer could be found to be a truthful representation of the opinion he held. Although we agree that the question was subjective, and that the issue of rescission turns on Liebling's state of mind and good faith, we are nonetheless satisfied that no reasonable fact-finder could conclude that his answer truly reflected his actual opinion. Therefore, we affirm on that ground and on the additional ground that a related exclusion justified the denial of coverage.

I
The basis of the equitable fraud contention was Liebling's answer of "No" to this question in Garden State's application form when he applied for the insurance policy on September 3, 1997:
Is the firm aware of any circumstances, or any allegations or contentions as to any incident which may result in a claim being made against the firm ... ?
The claim eventually arose from Liebling's representation of Anthony Barrett for injuries received in an automobile accident that occurred on June 30, 1992. Barrett was injured when the car he was driving collided with a vehicle owned by the United States Postal Service. Initially he retained an attorney named Craig R. Mitnick, who filed an administrative claim with the Postal Service in April 1994. The Postal Service denied the claim in a letter dated August 22, advising that any further legal action would have to involve a "suit against the United States of America in an appropriate United States District Court not later than six months from the date of mailing of this letter...." On February 21, 1995, Mitnick filed suit in the federal court in New Jersey, naming the Postal Service and its employee-driver as defendants rather than the United States. On March 21, Mitnick filed a substitution of attorney, signed by Liebling, stating that Liebling would represent Barrett. The parties agree that as a matter of federal law, Liebling had until June 21, a period of ninety days from the date he became Barrett's attorney, to amend the complaint and serve the government, and that he did not do so.
On August 10, 1995, the federal judge filed a "Notice of Call for Dismissal for Failure to Prosecute," since there was no evidence of service of process. Liebling replied with a certification indicating that service had been made. On June 4, 1996, the judge filed a second notice of dismissal for failure to prosecute and subsequently dismissed that notice after Liebling submitted an affidavit asserting that the named defendants had been served and that he was awaiting their answer. Thereafter, the Postal Service and its employee-driver moved for dismissal of Barrett's action for lack of jurisdiction. Liebling countered with a motion to amend the complaint to name the government as a defendant. The judge denied Liebling's motion and granted the defendants' motion in an opinion dated October 4, 1996. In that opinion, the judge stated that plaintiff's attorney "[r]ecognized that his suit against [the employee] and the Postal Service is not permitted under the [Federal Tort Claims Act]" and that was why he had filed the motion to amend the complaint to name the United States as the defendant. The judge also noted Liebling's arguments with respect to certain bases in the applicable rules that he contended supported his motion despite his failure to move within the requisite 120 days from the filing of the complaint.
*518 In opposition to Garden State's motion for summary judgment, Liebling certified the following:
At the time I completed the application for insurance with Garden State Indemnity Company, I had not received a copy of Judge Simandle's Order [and opinion] despite my request for same. The original Motion by the Deputy Attorney General and my Cross Motion to Amend the Complaint based on the relation-back doctrine was heard by Judge Simandle "on the papers" and no oral argument was permitted by Judge Simandle.
On the day of his ruling, I contacted Judge Simandle's chambers and spoke directly with his law clerk who indicated to me that the Deputy Attorney General's Motion had been granted and that my Motion to Amend the Complaint had been denied based upon "Statute of Limitations and the naming of the improper parties" in the lawsuit originally filed by the Law Offices of Mitnick, Josselson, DePersia and DePersia.
He further certified that he "immediately reached out to Mr. Barrett on at least five occasions in order to inform him that his case had been dismissed as a result of the action/inaction of his prior attorney...." The letters to which Liebling was referring merely ask that Barrett "contact my office as soon as possible so that we may schedule an appointment to discuss your case." The letters did not indicate that the complaint had been dismissed. The last letter was mailed on January 8, 1997, some seven months before Liebling applied for defendant's insurance policy. Barrett did not respond to the letters but he did file a malpractice action against his first attorney and Liebling on July 15, 1998. That of course is the action Garden State claims it had no obligation to defend on plaintiff's behalf because of its entitlement to rescission, a remedy that would exclude any claim for insurance coverage, not just this one.

II
Fraud is divided into two categories: legal fraud and equitable fraud. Within equitable fraud a further distinction is made when the statement relied on is a response to a question, depending on whether the question is objective or subjective.
In general, equitable fraud requires proof of (1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental reliance by the other party. Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619, 624, 432 A.2d 521 (1981). Unlike legal fraud, there need not be proof that the statement was made with knowledge that it was false. Ibid. In other words, a party seeking rescission based on equitable fraud need not prove "knowledge of the falsity and an intention to obtain an undue advantage therefrom." Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 609, 560 A.2d 655 (1989) (quoting Jewish Center, 86 N.J. at 624-25, 432 A.2d 521). "Even an innocent misrepresentation can constitute equitable fraud justifying rescission." Ledley v. William Penn Life Ins. Co., 138 N.J. 627, 635, 651 A.2d 92 (1995).
However, in applying the doctrine of equitable fraud to an insured's answers to questions posed in insurance applications, answers to subjective questions are treated differently from answers to objective questions. Ledley, 138 N.J. at 635-637, 651 A.2d 92 (1995). An objective question as one calling "for information within the applicant's knowledge" and a subjective question as one that "`seek[s] to probe the applicant's state of mind.'" Id. at 636, 651 A.2d 92 (quoting Formosa v. Equitable Life Assurance Soc'y, 166 N.J.Super. 8, 15, 398 A.2d 1301 (App.Div.), certif. denied, 81 N.J. 53, 404 A.2d 1153 (1979)). The Court observed that subjective questions are "concerned with more ambiguous issues," ibid., and then went on to explain the difference in this manner:

*519 The rationale behind the distinction between objective and subjective questions is that the answer to a subjective question will not constitute equitable fraud if "the question is directed toward probing the knowledge of the applicant and determining the state of his mind and ... the answer is a correct statement of the applicant's knowledge and belief...." Ettelson v. Metropolitan Life Ins. Co., 164 F.2d 660, 665 (3d Cir.1947); see also 1A John A. Appleman and Jean Appleman, Insurance Law and Practice § 246, at 129 (1981) (Appleman) (noting that in New Jersey, "the applicant's knowledge of the falsity of his representations is material only as respects `subjective questions'").

[Ibid.]
In an earlier opinion, Chief Justice Weintraub expressed essentially the same view when he observed for the Court, "Representations with respect to matters of opinion certify to the truthfulness with which the opinion is held rather than to the validity of the opinion itself." Merchants Indem. Corp. v. Eggleston, 37 N.J. 114, 123, 179 A.2d 505 (1962).
Given the principles enunciated by our Supreme Court in Eggleston and Ledley and Garden State's concession that the application-question is subjective, there is obviously no legal foundation for the contention that it is entitled to rescission on the ground that no reasonable attorney would have replied as Liebling did. When the question is subjective, as here, equitable fraud is present only if the answer was knowingly false.
In an effort to salvage its legal position, Garden State argues that we should be guided by three federal district court cases: Home Indemnity Co. Manchester, New Hampshire v. Toombs, 910 F.Supp. 1569 (N.D.Ga.1995); FDIC v. Moskowitz, 946 F.Supp. 322 (D.N.J.1996); and Esoldi v. Esoldi, 930 F.Supp. 1015 (D.N.J.1996). But none of these cases carries the day for Garden State.
In Toombs, the application-question answered "no" by the attorney was the same as the one which concerns us. The malpractice claim arose because the attorney had voluntarily dismissed his client's complaint and had thereafter re-filed it beyond the time allowed by the statute of limitations. He applied for the insurance while he was appealing from dismissal of the action. Applying Georgia law, the court held that the answer was objectively false. 910 F.Supp. at 1574. There was no discussion of the distinction we draw between objective and subjective questions. However, the result in Toombs is not necessarily inconsistent with that distinction. The case can be understood best as holding no more than that summary judgment was appropriate because, in light of the obviousness of the malpractice, the attorney had not answered the question honestly. If the case is read as holding that the answer constituted equitable fraud because a reasonable attorney would not have so answered, then it is simply inconsistent with the law of New Jersey.
Moskowitz involved a bank's answer to a subjective question. The court, applying New Jersey law, held that in that circumstance the insurer must "`demonstrate not only that an answer was false, but also that the insured knew that it was false.'" 946 F.Supp. at 330 (quoting Fidelity & Deposit Co. of Maryland v. Hudson United Bank, 653 F.2d 766, 773 (3rd Cir.1981)). Although the court described the answer as objectively false, it reached that conclusion because in its view a response to a subjective question is objectively false when based on the circumstances known to the applicant the question has only one honest answer. Ibid. In other words, applying a summary judgment model, the court, in essence, determined that no reasonable fact-finder could conclude anything other than that the bank knew its answer was false. Thus, this case provides no support for Garden State apart from its underlying thesis that summary judgment may at times be applied even where *520 state of mind is in issue, a subject to which we will turn later.
Esoldi, which concerned an attorney who answered "no" to the same question as Liebling, required the application of New Jersey law, but the opinion fails to cite either Ledley or Eggleston or discuss the distinction between subjective and objective questions. Although the court described the question as clear, it did so only in the sense that it required a positive response even if the client had not made a claim against the lawyer, provided the lawyer was "objectively aware" that the events could give rise to a claim. 930 F.Supp. at 1022. The use of the phrase "objectively aware" is ambiguous. It could mean that on the facts known to the attorney he must have believed that a claim might be filed against him, and therefore he did not answer the question honestly; or it could mean that a reasonable attorney, aware of the facts and applicable legal principles, would have had that knowledge even if this attorney did not. Since the attorney in Esoldi admitted that he knew a claim might be filed when he applied for the insurance but felt he was entitled to answer the question "no" because he had not yet received a claim letter from his client, it would appear that the court was using the phrase "objectively aware" in the first sense. Thus, the case is nothing more than an application of the summary judgment model to a state of mind case where the facts allow for only one conclusion respecting the attorney's true state of mind.
Other jurisdictions have clearly endorsed a subjective standard when the insured has been asked a subjective question. For example, in Shaheen & Gordon v. Home Ins. Co., 143 N.H. 35, 719 A.2d 562 (1998), the application for attorney malpractice insurance asked, "is any lawyer aware of ... any incident, act or omission which might reasonably be expected to be the basis of a claim...." Id. at 564. Despite the arguably objective phrasing of the question, arising from the phrase "might reasonably be expected," the court held that the question was ambiguous, id. at 566, and observed:
By using the phrase "reasonably be expected," Home Insurance apparently requires that its insureds exercise professional judgment at several critical junctures. First, Home Insurance requires insureds to exercise their judgment before triggering the reporting requirement for potential claims. A similar ambiguity arises upon renewal, when Home Insurance requires its insureds to disclose "any incident, act or omission which might reasonably be expected to be the basis of a claim or suit arising out of the performance of professional services for others." * * * If Home Insurance wishes to require reporting in every instance of an actual or a potential claim in order to guarantee coverage, it must use clear policy language to do so.

[Id. at 566-67.]
The court concluded that the provision "does not indicate whether notice to the insurer is required when all elements of a malpractice claim are present, or when, based on the parties and circumstances, a malpractice claim on the merits is likely." Id. at 566. Consequently, the court applied the latter view. Ibid.
In essence, the court determined that the application-question would not permit a denial of coverage so long as the insured had made a good faith professional judgment.
At least three other courts have endorsed the subjective standard in insurance application cases that did not involve attorneys.
In Citizens Bank of Jonesboro v. Western Emp. Ins., 865 F.2d 964 (8th Cir.1989), the application asked if the applicant was "aware of any fact, circumstance or situation... which he has reason to believe might result in any future claim which would fall within the scope of the proposed insurance?" Id. at 965. The court rejected *521 the insurance company's contention that the question was objective, saying this:
The language [of the question] calls for the applicant's belief about whether any known fact or circumstance might give rise to a future claim. The question thus contains a judgmental component and implicitly acknowledges the lack of absolute certainty in the answer.

[Id. at 966.]
In Enserch Corp. v. Shand Morahan & Co., Inc., 952 F.2d 1485 (5th Cir.1992), the application for insurance asked the applicant "to state if it knew of any circumstances that might give rise to claims" against it. Id. at 1490. Again, the insurance company urged that the court apply an objective standard, namely whether the applicant knew or should have known of the pertinent circumstances. The court declined on the ground that the question was subjective. Id. at 1496.
In American Guar. and Liab. Ins. Co. v. Fojanini, 90 F.Supp.2d 615 (E.D.Pa.2000), the application asked if any "director has any `knowledge or information' of acts errors or omissions `that he/she believes either will give rise or could give rise' to a claim or lawsuit." Id. at 620. The court determined that the question "calls for a purely subjective inquiry into the actual beliefs of [the applicant]." Ibid.
One court has gone even further in the context of an attorney malpractice policy. In General Accident Ins. Co. of America v. Trefts, 657 F.Supp. 164 (E.D.Mo.1987), the question asked was whether any applicant "know[s] of any circumstances, act, error or omission that could result in a professional liability claim against him or his predecessors in business?" Id. at 165. The court interpreted the question as requiring disclosure "only in those circumstances when a client has given to the lawyer some indication through a complaint or expression of dissatisfaction with his services that a claim might or would be made." Id. at 167. The court reached this conclusion because of its recognition that "virtually any circumstance, act, error or omission in the course of legal representation could result in a professional liability claim being made against the lawyer by a disappointed client, but that not all do." Ibid. However, the court was applying the law of Missouri, and the case it relied on held that coverage would be denied if the applicant "could have reasonably foreseen" that a claim would be made. Fremont Indem. Co. v. Lawton-Byrne-Bruner Ins., 701 S.W.2d 737, 742 (Mo.App.1985). Thus, although the Trefts conclusion might be welcome by attorneys, it is an incorrect statement of the state law it was purporting to apply. Furthermore, its result is unsound; it would unfairly expose insurance companies to claims that the attorney knew would in all likelihood be made even though no claim letter had been received before the application for insurance was made.
Under a claims-made legal malpractice insurance policy, the insured's protection is typically limited to claims made and reported to the insurer during the twelve months following issuance of the policy. Although the statute of limitations for legal malpractice actions is six years after the action has accrued, N.J.S.A. 2A:14-1, Carney v. Finn, 145 N.J.Super. 234, 235-36, 367 A.2d 458 (App. Div.1976), by application of the discovery rule a lawyer, and his claims-made insurer, can easily be confronted by a claim involving malpractice that occurred far more than six years before the suit was filed. Grunwald v. Bronkesh, 131 N.J. 483, 494, 621 A.2d 459 (1993). Consequently, a question of the kind involved in this case imposes a substantial burden on the attorney with respect to his recollection and, depending on the circumstances, his judgment as to whether his conduct may result in a malpractice claim. On the other hand, from the insurer's point of view, an accurate answer is important to its assessment of the risk. The insurer would like to avoid coverage when an attorney applies for a policy because he knows that a malpractice *522 claim is likely to be filed and when a reasonable attorney would have so concluded. Although the balancing of these interests has not been specifically addressed in this state, under Ledley and Eggleston, it is clear that since the question was subjective the answer is to be judged on the attorney's state of mind. If he honestly believed that a malpractice claim was unlikely, his negative answer to the question posed in this case is not a misrepresentation.

III
Garden State, in addition to citing the application-question already discussed, sets before us the following exclusion in the malpractice policy issued to Liebling:
We do not insure here any claim ... of which:
....
Any insured, at the inception date of this contract, knew or reasonably could have foreseen that any such act, error, or omission might be expected to give rise to a claim otherwise insured here.
A number of courts have construed this or similarly worded exclusions as creating an objective standard for denial of coverage in attorney malpractice insurance cases. See, e.g., Selko v. Home Ins. Co., 139 F.3d 146 (3rd Cir.1998) (interpreting, or more accurately, predicting Pennsylvania law); Stiefel v. Illinois Union Ins. Co., 116 Ill.App.3d 352, 72 Ill.Dec. 141, 452 N.E.2d 73 (1983); Bellefonte Ins. Co. v. Albert, 99 A.D.2d 947, 472 N.Y.S.2d 635 (1984); and Tewell, Thorpe v. Continental Cas., 64 Wash.App. 571, 825 P.2d 724 (1992). The only fully-reasoned of those cases is Selko, to which we turn our attention.
In Selko, the application asked does any lawyer ... know of any circumstances... that could result in a professional liability claim....

[139 F.3d at 149.]
On the other hand, the exclusion referred to any claim as to which the Insured had no basis to believe that the Insured had breached a professional duty....

[Ibid.]
Although the insurance company had relied on both the application and the exclusion, the court limited its discussion to the exclusion. It found that the "no basis to believe" language created an unambiguous and objective standard, requiring, however, a two-stage analysis:
First, it must be shown that the insured knew of certain facts. Second, in order to determine whether the knowledge actually possessed by the insured was sufficient to create a "basis to believe," it must be determined that a reasonable lawyer in possession of such facts would have had a basis to believe that the insured had breached a professional duty.

[Id. at 152.]
Under this approach, the court explained that
the insured may not successfully defend on the ground that he was uniquely unaware of ethical and fiduciary principles that all lawyers would know or that he did not understand the implications of conduct and events that any reasonable lawyer would have grasped.

[Ibid.]
In reaching this result, the court rejected the attorney's argument that the "no basis to believe" language should be construed as if it read "provided ... the insured neither knew nor believed that the insured had breached a professional duty[,]" Id. at 151, based on the following analysis:
There is, however, a significant difference in meaning between these two formulations. The latter wording, had it been incorporated in the policy, would, indeed, have indicated that the insured's own knowledge and belief were the touchstones. But the actual policy language is different. Its phraseology *523 that "the insured had [no basis to believe]" refers, it is true, to the factual predicate possessed by the insured. But it measures that predicate by the impersonal standard of a "basis to believe," not by what the insured knew or believed. Had the provision been meant to stand or fall on the individual insured's subjective assessment of the known facts, it could easily have used the words "knew" or "believed," as indicated above. Instead, by using the words "basis to believe," the policy pointed to an objective criterion.

[Id. at 152.]
Although the court did not specifically analyze the phrasing of the application, since the application spoke in terms of what the attorney knew, and since the court relied only on the exclusion, we may infer that the application, standing alone, would not have provided a basis for the avoidance of coverage. That interpretation is supported by the discussion of Selko in another case predicting Pennsylvania law, American Guar. and Liab. Ins. Co. v. Fojanini, 90 F.Supp.2d at 620.
Returning to the language of the exclusion discussed in Selko, we acknowledge that the court's interpretation is sound as a matter of logic. Nevertheless, we reject it because it does not meet the reasonable expectations of an attorney seeking the protection afforded by malpractice insurance. That view was eloquently articulated in Estate of Logan v. Northwestern Nat. Cas. Co., 144 Wis.2d 318, 424 N.W.2d 179 (1988), an opinion with which we entirely agree.
Logan's exclusion, like Selko's, provided that coverage would be denied if the insured attorney "had a `basis to believe' that the insured had committed a breach of a professional duty." Id. at 185-86. The insurance company argued that under that exclusion a claim should be excepted from coverage "if the insured knew or should have known that the insured had breached a professional duty." Id. at 186. The court disagreed and analyzed the problem in the following manner:
However, we reject the objective standard because the use of an objective standard is inconsistent with the purpose of the policy and what an insured would have understood the exception to provide. Accordingly, whether the policy excepts coverage for a claim based on a breach of a professional duty occurring prior to the effective date of the policy must be determined by analyzing whether the insured (Dowling) knew or believed, prior to the effective date of the policy, that he had breached a professional duty.
The difficulty with applying an objective standard is apparent when examined in the context of a hypothetical error or omission by an attorney. For example, an attorney commits a breach of his or her professional duty by not filing a suit within the one year statute of limitations. The attorney did not file within the year because he or she believed erroneously that the statute of limitations was three years. The statute was specific, and the attorney should have known that the statute of limitations was one year. Under an objective standard, any subsequent policy would except coverage for a claim based on failing to file the suit within one year because, prior to the effective date of the subsequent policy, the attorney should have known that he or she had breached a professional duty by failing to file the suit within the one year statute of limitations. Thus, because the attorney did not know the correct statute of limitations, but should have known the correct statute, the attorney not only committed a breach of his or her professional duty, but he or she is also denied insurance coverage. Because we conclude that the parties could not have intended the policy to except coverage in such a situation, and because an exception of coverage in such a situation is contrary to the purpose of professional liability insurance, we hold *524 that whether an insured had a "basis to believe" must be treated by whether the insured knew or believed that the insured had committed a breach of his or her professional duty.

[Id. at 186 (emphasis added).]
In Werner Indus., Inc. v. First State Ins. Co., 112 N.J. 30, 548 A.2d 188 (1988), our Supreme Court reiterated that the "fundamental principle of insurance law is to fulfill the objectively reasonable expectations of the parties." Id. at 35, 548 A.2d 188. Thus, "[a]t times, even an unambiguous [insurance] contract has been interpreted contrary to its plain meaning so as to fulfill the reasonable expectations of the insured[.]" Id. at 35-36, 548 A.2d 188. Based on that settled principle and the reasoning of the Supreme Court of Wisconsin in Logan, we hold that the "reasonably could have foreseen" exclusion in Garden State's policy shall be deemed to mean that coverage may be denied only if the insured knew or believed that there had been a deviation from professional standards and that based on all the known circumstances it was likely that a malpractice claim would be made.

IV
In resolving the motion for summary judgment in Garden State's favor, the judge found as a fact that Liebling "was objectively aware of his potential exposure to a malpractice claim by Barrett prior to his application ... for malpractice coverage." [Emphasis added.] As we noted in our discussion of Esoldi, that phrase is decidedly ambiguous. It appears to have given rise to Garden State's argument that it should prevail without regard to what Liebling actually believed because no reasonable attorney could have so concluded. Liebling, as we have observed, correctly responds that the issue is not what a reasonable attorney would have believed but what he in fact believed. We are inclined to understand the judge's ruling as reflecting his determination that even viewing the evidence most favorably from Liebling's point of view, his answer to the question did not reflect an opinion he truthfully held. In any case, that is our conclusion for the following reasons.
On a motion for summary judgment, the question is whether the evidence presented, "when viewed in the light most favorable to the non-moving party," is sufficient to permit a "rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). When subjective elements such as state of mind or good faith are at issue, "a conclusion from papers alone that palpably there exists no genuine issue of material fact will ordinarily be very difficult to sustain." Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 76, 110 A.2d 24 (1954). The demeanor of the witness will usually be of "vital importance" in such cases. Ibid. Nonetheless, even where credibility is in issue, if there is a "single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a `genuine' issue of material fact for purposes of Rule 4:46-2." Brill, 142 N.J. at 540, 666 A.2d 146; Simpson v. Widger, 311 N.J.Super. 379, 394, 709 A.2d 1366 (App.Div.1998).
Liebling argues that his certification provided sufficient evidence that he was unaware of any potential malpractice claim when he submitted his application for insurance because it "clearly indicates that he justifiably believed Barrett's claim was dismissed for failing to name proper parties and the expiration of the Statute of Limitations, both of which occurred while Barrett's matter was handled by another attorney."
In short, he seeks an opportunity to testify before the trial court with respect to his state of mind for the purpose of demonstrating that even if his opinion was invalid it was nonetheless what he truly thought. However, he does not suggest that his testimony would go beyond the *525 information set forth in his certification. Rather, he appears to want the opportunity to swear to those facts in front of the judge in the belief that his demeanor would convince the judge of the honesty of his opinion.
Liebling's theory is that his certification shows that he honestly relied on the statement of the federal judge's law clerk that the granting of the motion to dismiss and the denial of his motion to amend the complaint to make the United States a defendant was "based upon `Statute of Limitations and the naming of improper parties' in the lawsuit originally filed" by his predecessor. Although we may be obliged to accept his statement that he did not receive the federal judge's opinion until after he had submitted the insurance application, he does not deny that had he read it, he would have known of the potential for a malpractice suit. The significant point, however, is that the judge's opinion, by reference to Liebling's motion and arguments, shows that when he applied for the insurance, Liebling was aware of the principles of federal law standing in the way of maintenance of his client's cause of action against the government. In particular, the opinion reflects his knowledge that a motion to make the United States a defendant would have been timely if made during the first 120 days after the suit was filed. Since he represented Barrett during the last ninety days of that period, and since he knew the law by the time he filed his motion, he must have known of his potential liability then and when he applied for the insurance. In other words, Liebling's belief that the judge may have limited his ruling to a ground involving the first lawyer is beside the point: the ruling did not change the facts or law bearing on Liebling's mistake.
In these circumstances, which include of course his client's failure to respond to any of the letters he sent after losing the motion and the absence of any indication in those letters that the case had been dismissed, we are satisfied that not only would no reasonable attorney have felt secure from a claim but that Liebling did not honestly believe that he was secure. Therefore, his answer in the application was knowingly false, and Garden State was entitled to rescission of the policy on the ground of equitable fraud.[1] For essentially the same reasons, the policy's exclusion justified Garden State's denial of coverage.

V
Liebling also argues that Garden State failed to prove another element of equitable fraud; namely reliance on the misrepresentation to its detriment. Jewish Ctr. of Sussex Cty., 86 N.J. at 624, 432 A.2d 521. This claim was neither raised below nor argued in the brief submitted to us. "An appellate court will consider matters not properly raised below only if the issue is one `of sufficient public concern.'" Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 230, 708 A.2d 401 (1998) (citations omitted). Since the issue here concerns purely private matters, appellate consideration is unwarranted. Moreover, an issue not briefed, as is the case here, is deemed waived. Matter of Bloomingdale Convalescent Ctr., 233 N.J.Super. 46, 48 n. 1, 558 A.2d 19 (App.Div.1989).
Affirmed.
NOTES
[1] At oral argument, Garden State represented that if granted rescission it would return the premium with interest, a course we consider mandated by Eggleston, 37 N.J. at 130, 179 A.2d 505.