**Joseph GUIDA, M.D., Plaintiff,**

v.

**The PAUL REVERE LIFE INSURANCE COMPANY and Chester I. Warren, Defendants.**

**Civil Action No. 93–3871 (MLP).**

United States District Court, D. New Jersey.

June 30, 1995.

Michael F. Chazkel, Chazkel & Associates, P.C., East Brunswick, New Jersey, for Plaintiff.

Douglas F. Johnson, Earp, Cohn, Leone & Pendery, P.C., Westmont, New Jersey, for Defendant Paul Revere Life Insurance Company.

1. All reference to defense exhibits is to the exhibits contained in the appendix submitted by Paul Revere unless otherwise indicated.

2. Questions 6 through 9 on the application pertain to the state of the applicant's health and, in relevant part, seek the following information:

   6. Have you **ever** been diagnosed or treated for:

      .　　.　　.　　.　　.

      b. Disease or disorder of the heart or circulatory system, lungs, kidneys, bladder, genital or reproductive organs, brain or nervous system, skin, eyes, ears or speech?

      .　　.　　.　　.　　.

   7. In the past **5 years,** have you had any medical advice or operation, physical exam, treat-

Thomas J. Gosse, Haddon Heights, New Jersey, for Defendant Chester Warren.

## MEMORANDUM AND ORDER

PARELL, District Judge.

This matter is before the Court on motion for summary judgment by defendant Paul Revere Life Insurance Company and on cross-motions for summary judgment by defendant Chester Warren and by plaintiff Joseph Guida. For the following reasons, the motion for summary judgment by defendant Paul Revere Life Insurance Company is granted, the cross-motion for summary judgment by defendant Chester Warren is granted, and the cross-motion for summary judgment by plaintiff Joseph Guida is denied.

## *BACKGROUND*

This action, filed on August 26, 1993, involves a claim for disability benefits by plaintiff Joseph Guida, M.D. ("Dr. Guida") pursuant to certain disability insurance policies issued to him by defendant Paul Revere Life Insurance Company ("Paul Revere") through insurance agent and/or broker defendant Chester I. Warren ("Warren").

In 1991, insurance agent/broker Warren met with Dr. Guida, an anesthesiologist at Community Medical Center, to discuss Dr. Guida's insurance needs. Pursuant to that meeting, Dr. Guida decided to apply to Paul Revere for a disability income insurance policy. (Def.'s Exs. F and K.)[1] Warren reviewed the application for the disability policy with Dr. Guida and asked him each of the questions on the application, including those pertaining to the state of his health.[2] (*Id.*)

ment, illness, abnormality or injury not listed above?
Are you currently receiving any medical advice or treatment?

.　　.　　.　　.　　.

9. Give details to all "Yes" answers to **6, 7** or **8.** Include exact diagnosis, dates, duration, physicians and addresses.
(Def.'s Ex. K.)

Dr. Guida responded to each of Warren's questions, and Warren filled in the answers on the application based upon the answers given by Dr. Guida.[3] (*Id.*) Dr. Guida reviewed the application, and then signed it. This application was dated June 26, 1991. (Def.'s Ex. N.)

The 1991 disability policy was issued to Dr. Guida by Paul Revere on September 6, 1991 and provided disability benefits in the amount of $12,000 per month in the event of total disability with an annual increase of $500 per monthly payment for a total of five years.[4] (*Id.*)

On January 9, 1992, Dr. Guida first consulted Dr. Stephen Fontanella, an ear, nose and throat doctor, complaining of fullness in both ears, vertigo or dizziness, ringing in the ears (tinnitus), especially in the right ear, and a sensation of hearing loss in the right ear. (Def.'s Ex. C.) Dr. Fontanella examined Dr. Guida and also had an audiologist on his staff perform an audiology exam on Dr. Guida, since he was complaining of mild hearing loss. Based upon these complaints and his examination and tests, Dr. Fontanella prescribed a diuretic and an anti-vertigo medication for Dr. Guida, as well as special vitamins. (*Id.*) Dr. Guida filled the prescriptions for the diuretic Chlorothiazide (50 tablets) and for the anti-vertigo drug Meclizine (90 tablets). (Def.'s Ex. E.)

Dr. Fontanella referred Dr. Guida to Alan Gertner ("Gertner"), an audiologist at the Better Hearing Center, for a full set of audiology tests. Dr. Guida had these audiology tests performed on January 17, 1992 and on January 23, 1992. (Def.'s Exs. C and D.) Dr. Guida filled out a patient intake sheet at Gertner's office on January 17, 1992 wherein he described his medical problem as: "Vertigo, mild nausea, fullness in [or] above both ears, some loss of hearing in [right] ear with ringing, occasional roaring." (Def.'s Ex. D.) Gertner performed various diagnostic tests on Dr. Guida and, upon the completion of these tests, prepared a report which he sent

to Dr. Fontanella. (*Id.*) In Gertner's report, he states that "Dr. Guida presented complaints of vertigo accompanied by mild nausea and fullness in his ears [and that these] symptoms began early last month [December 1991] and have continued." (*Id.*) In his report, Gertner concludes:

> These findings, coupled with patient's reports of fullness in the ear and of episodic vertigo with nausea supports the possibility of an early *Meniere's Disease* or some allergic or autoimmune type of inner ear finding. Recommend medical follow-up as appropriate to confirm these results and r/o [rule out] retrocochlear involvement and to treat as indicated.

(*Id.*) (emphasis added).

Although Gertner cannot specifically remember if he discussed these test results with Dr. Guida, it is Gertner's regular practice to discuss test results with patients. (*Id.*)

Dr. Guida was seen by Dr. Fontanella again on February 25, 1992. (Def.'s Ex. C.) On February 25, 1992, Dr. Fontanella had received Gertner's report pertaining to the audiology tests performed by Gertner in January and Dr. Fontanella discussed these results with Dr. Guida. Dr. Fontanella also gave Dr. Guida a copy of the audiology test results. (*Id.*) Dr. Fontanella's records provide that on February 25, 1992, Dr. Guida was complaining of persistent vertigo and tinnitus especially in the right ear, but also the left, and of fullness in the ears. (*Id.*) At this point, Dr. Fontanella recommended that Dr. Guida have a full vertigo workup done, including blood tests, to determine if the vertigo was being caused by anemia, diabetes, thyroid or other problems. (*Id.*) Dr. Fontanella also recommended a CAT scan to determine if the vertigo was a symptom of a more serious problem such as a brain or an ear tumor. (*Id.*) However, Dr. Guida chose not to have these tests done at this point but rather he refilled his prescription for the diuretic Chlorothiazide (50 tablets) and the

---

**3.** On the 1991 application, the answer to the first part of Question 7 was checked "Yes." The detailed response to Question 7 provided in the space below Question 9 was: "7. Insurance Physicals."

**4.** The payment of benefits under the original 1991 disability policy is not at issue in this case and Dr. Guida is currently receiving the maximum payment available per month in disability benefits under this original policy.

anti-vertigo medication Meclizine (90 tablets). (Def.'s Exs. C and E.)

Sometime prior to May of 1992, Dr. Guida apparently saw Dr. Fontanella at Community Medical Center, where they both worked, and mentioned to him that he was still having problems with the vertigo. Dr. Fontanella stressed to him that he needed to have the full vertigo workup done, including the blood work and the CAT scan. (Def.'s Ex. C.) Dr. Guida had the blood tests and the CAT scan performed on May 7, 1992. The results of the blood tests were essentially normal, except for high cholesterol.[5] (Id.) The CAT scan was normal, which, while it did not rule out that Dr. Guida had a vertigo problem, enabled Dr. Fontanella to rule out certain possible causes of the vertigo, such as brain or ear tumors. (Id.) Dr. Guida had the CAT scan done at Ocean Medical Imaging Center, where he filled out a Patient Data Sheet. A question on the Patient Data Sheet asked for "a brief summary of your medical problems as they pertain to this scan" to which Dr. Guida responded: "Vertigo, fullness above both ears, some episodes worse than others, with left sided fullness worse than right." (Def.'s Ex. F.)

Sometime around April of 1992, Dr. Guida contacted Warren to inquire about certain insurance discounts which Dr. Guida had become aware of through another insurance agent who had visited Community Medical Center[6] and also to inquire about the possibility of purchasing excess disability insurance benefits in addition to the benefits under the 1991 policy and about the possibility of purchasing a business overhead policy. (Def.'s Ex. K.) Thereafter, Warren conferred with Judy Platt, a brokerage representative at Paul Revere, regarding the insurance discount and the additional insurance coverage and benefits about which Dr. Guida

had inquired. (Id.) Warren then contacted Dr. Guida and set up a meeting with him for May 19, 1992.

Warren and Dr. Guida met on May 19, 1992 and Warren informed Dr. Guida that he would receive the discount on the 1991 disability policy. Warren and Dr. Guida discussed the types of additional insurance coverage and benefits available to Dr. Guida per his prior inquiry. (Id.) At this meeting Dr. Guida told Warren that he wanted to apply for $8,000 of excess monthly disability coverage in addition to the approximately $12,000 of coverage already provided for by the 1991 disability policy and that he also wanted to change the 1991 disability policy from a policy under which benefits would be paid until age 65 to a lifetime benefit policy.[7] (Id.)

At this meeting on May 19, 1992, Warren asked Dr. Guida if there had been any change in his health in the eleven months since he had filled out the application for the 1991 disability policy. (Id.) Dr. Guida responded that there had been no changes in his health. (Id.) Dr. Guida did mention that he had seen his physician for certain flu-like symptoms and nausea he had experienced in December 1991 or January 1992 but that these symptoms, which he stated had probably been due to a viral infection, had since disappeared. (Id.) Other than perhaps the general statement that he had seen his physician for slight nausea and other flu-like symptoms, Dr. Guida did not tell Warren of his visits to Dr. Fontanella in January 1992 and in February 1992. Nor did he tell Warren about any of the various medical tests which had been performed on him in January and February or about the fact that he had been taking prescribed medication since January for an ongoing problem with vertigo or about the blood tests and the CAT scan

---

5. However, Dr. Fontanella testified that high cholesterol is suggestive of Meniere's disease. (Def.'s Ex. C.)

6. Apparently, Community Medical Center had entered into some sort of arrangement with an insurance firm in Linwood, New Jersey whereby physicians working for Community Medical Center could obtain disability insurance through Paul Revere at a discounted rate.

7. Also discussed at this meeting was a business overhead policy which Dr. Guida did apply for and purchase from Paul Revere. However, Dr. Guida's claims pertaining to this business overhead policy are no longer at issue in this action pursuant to a Consent Order entered by this Court on July 1, 1994, wherein the parties agreed to dismiss with prejudice Counts I, II and III of the complaint to the extent these counts stated claims related to Paul Revere Policy Number 01025613190.

which had been performed within the last two weeks. (*Id.*)

At the May 19th meeting, Warren provided Dr. Guida with an application for excess disability coverage and Dr. Guida signed that application at this meeting. (*Id.*) The answers to the health related questions on the application for excess coverage were not filled in when Dr. Guida signed the application. (*Id.*) However, based upon Dr. Guida's response to Warren's inquiry regarding any changes in his health since he had filled out the 1991 application, it was Warren's understanding "that the answers to those questions 6 through 9 were absolutely the same as the answers he gave 11 months before on the original application." (*Id.* at 40.)

On May 28, 1992, Dr. Guida experienced a vertigo attack so severe that his wife had to drive him to Dr. Fontanella's office to be seen. (Def.'s Ex. F.) On this date, Dr. Guida complained to Dr. Fontanella of fullness in his ears, tinnitus, and pressure in his ear in addition to severe vertigo. (Def.'s Ex. C.) Dr. Fontanella performed some diagnostic tests at this time. Although the results of these tests were not conclusive, Dr. Fontanella stated that, at that point, based on his examination of Dr. Guida and the test results, his diagnosis of Dr. Guida was that he possibly had a viral problem, TMJ or Meniere's disease. (*Id.*)

The application for the excess disability coverage and the application for the change to lifetime benefits were submitted by Warren to Paul Revere on May 29, 1992. (Def.'s Ex. E, K and H.)

On May 31, 1992, Dr. Guida suffered another severe attack of vertigo which kept him bed-ridden for at least three hours. (Def.'s Ex. E.) On June 4, 1992, Dr. Guida suffered a vertigo attack at the hospital which rendered him unable to perform his duties as an anesthesiologist. (*Id.*) Dr. Guida did not inform Paul Revere or Chester Warren of any of these attacks.

In a memo dated June 4, 1992 written by Dr. Guida to Dr. Buensuceso, the Chairwoman of the Anesthesiology Department as Community Medical Center, Dr. Guida states:

> On Thursday, June 4, 1992, I reported to the CMC Operating room and completed anesthetics on all scheduled patients assigned to me. Throughout the day, I was not feeling well since as you already know, I have been afflicted with vertigo, for which I am currently under treatment. Over the last few weeks, I have had a number of vertigious episodes, none of which has interfered with my delivery of safe anesthesia. Nevertheless, toward the end of today's schedule, my vertigo worsened, making it unacceptable for me to continue delivering anesthesia to any further patients.

(Def.'s Ex. E.)

On June 17, 1992, Dr. Guida returned to Dr. Fontanella's office complaining of persistent vertigo and fullness in his left ear. (Def.'s Ex. C.) Dr. Fontanella again prescribed the diuretic and the anti-vertigo drug. (*Id.*) At this time, Dr. Fontanella wrote a letter to Dr. Buensuceso dated June 17, 1992, at Dr. Guida's request, wherein Dr. Fontanella stated:

> Dr. Joseph Guida has been under my care since January 9, 1992 for episodic vertigo. He is on medications which for the most part have controlled his vertigo. A full vertigo workup has been performed and is suggestive of Meniere's Disease. Nevertheless, at this time, I do not feel that he represents a threat to the care of any patient, nor do I believe that this condition would affect his ability to deliver anesthesia at the Community Medical Center Operating Room at this time; however, I strongly recommend a light schedule for Dr. Guida to facilitate any possible recovery or reduce further episodes.

(*Id.*)

A lifetime benefit rider was issued to Dr. Guida by Paul Revere on July 6, 1992 and an excess disability policy was issued to Dr. Guida by Paul Revere on July 28, 1992. At no time between May 19, 1992 and the issuance of the excess disability policy and the lifetime benefit rider did Dr. Guida disclose to Warren or to Paul Revere any information regarding a change in his health. Specifical-

ly, Dr. Guida never disclosed to Warren or to Paul Revere that he had suffered vertigo attacks, that he had been seen and treated by Dr. Fontanella on numerous occasions in connection with his vertigo attacks, or that it was Dr. Fontanella's medical opinion that his full vertigo workup was suggestive of Meniere's disease.

In September 1992, Dr. Fontanella formally diagnosed Dr. Guida as having Meniere's Disease. (*Id.*) In September 1992, Dr. Guida filed a claim for disability benefits with Paul Revere wherein he indicated that he had become disabled as of September 15, 1992. (Def.'s Ex. F.) Upon receipt of Dr. Guida's claim, Paul Revere obtained Dr. Fontanella's records regarding Dr. Guida and, after reviewing them, determined that Dr. Guida had failed to disclose material information concerning a condition which pre-dated the issuance of the 1992 policies. (Def.'s Ex. G.) By letter dated November 17, 1992, Paul Revere notified Dr. Guida of its decision to rescind the excess disability policy and the rider changing 1991 policy benefits from age 65 to lifetime. (*Id.*)

Cheryl Akerson, a Director of Individual Disability Underwriting at Paul Revere, certifies that, if Paul Revere had known of the changed state of Dr. Guida's health, it would not have issued the excess disability policy or the rider changing the benefits from age 65 to lifetime. (Def.'s Ex. M.) [8]

## DISCUSSION

■■■ Each of the parties here has moved for summary judgment in their favor. A court shall enter summary judgment under Federal Rule of Civil Procedure 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In order to defeat a motion for summary judgment, the opposing party must establish that a genuine issue of material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township,* 772 F.2d 1103, 1109 (3d

Cir.1985), *cert. denied,* 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986). A nonmoving party may not rely on mere allegations; it must present actual evidence that creates a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citing *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). Issues of fact are genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510.

The application for the 1991 disability policy, as well as the application for the excess disability policy, contains the following "change in health" provisions:

It is understood and agreed as follow:

. . . . .

(4) The insurance applied for will not take effect unless the issuance and delivery of the policy and payment of the first premium occur before the Proposed Insured has visited, consulted or received treatment or diagnosis from a physician or other medical practitioner after the date of this Application.

(Def.'s Exs. N and P.)

The application to change the 1991 policy from an age 65 benefits policy to a lifetime benefits policy contains a similar provision, providing as follows:

**It is understood and agreed as follows:**

. . . . .

(2) The change(s) applied for in Part 2 ["Addition(s) or Increase(s) or Reconsideration(s)"] will not become effective until:

(a) This Application is approved at the Home Office; and

---

**8.** Paul Revere stipulates that Dr. Guida is entitled to a refund of the premiums which he paid on the excess coverage policy and the lifetime bene-

fit rider. A previous tender of this refund by Paul Revere was not accepted by Dr. Guida.

(b) Payment of the full amount required is made while my health remains as stated above.

(Def.'s Ex. E.)

■ "[U]nder New Jersey law, when events occur between the submission of an application for insurance and the effective date of the policy that cause information contained in the application to be untrue, the insured has an obligation to disclose this fact to the insurance company." *Fidelity & Deposit Co. of Maryland v. Hudson United Bank*, 653 F.2d 766, 772 (3d Cir.1981) (citing *Weir v. City Title Ins. Co.*, 125 N.J.Super. 23, 308 A.2d 357 (App.Div.1973)). Where an insurance applicant learns new information related to his health during the insurance application process and fails to disclose such information, a subsequently issued policy may be deemed void as a binding contract. *Id.; see also Affiliated FM Ins. Co. v. Kushner Cos.*, 265 N.J.Super. 454, 627 A.2d 710, 718 (Law Div.1993).

As stated by the court in *Weir v. City Title Ins. Co.*, 125 N.J.Super. 23, 308 A.2d 357 (App.Div.1973):

> It is well settled that, where an application for insurance has been submitted to an insurer and, before the policy is issued, a change of conditions material to the risk occurs or is discovered by the applicant, he is under an obligation to inform the insurer promptly. The knowing suppression or failure to make timely disclosure of such information constitutes a material misrepresentation.... Insurance policies are traditionally contracts uberrimae fidei and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option.

*Id.*, 308 A.2d at 360–61 (relying upon *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 316–317, 48 S.Ct. 512, 513, 72 L.Ed. 895 (1928)); *see Township of Gloucester v. Maryland Cas. Co.*, 668 F.Supp. 394, 403 (D.N.J. 1987) ("One cannot obtain insurance for a risk that the insured knows has already transpired."); *see also Olsen v. Federal Kemper Life Assurance Co.*, 68 Or.App. 90, 681 P.2d 144 (1984), *aff'd*, 299 Or. 169, 700 P.2d 231 (1985).

■ Dr. Guida contends that he did not misrepresent the state of his health when he met with Chester Warren on May 19, 1992, because at that point it was his belief that he had suffered from a viral infection in early 1992 which had since resolved itself. Even assuming this to be true, or at least to be the true state of mind of Dr. Guida at the point he met with Warren and discussed the application for the excess coverage and the application to change to lifetime benefits, it is clear that between this time and the time the policies were issued on July 6, 1992 and July 28, 1992, Dr. Guida experienced a significant and material change in his medical condition which triggered his duty to disclose this newly acquired information pertaining to his health or medical condition.

Although Dr. Guida testified that he did not believe he had any obligation to inform Paul Revere or Chester Warren of the increasingly severe episodes of vertigo or the fact that he was being treated by Dr. Fontanella for the problem, this does not change the fact that Dr. Guida was under a continuing duty to disclose to Paul Revere any changes in his physical condition of which he became aware after making application for the policy and prior to the delivery thereof. *See* Appleman, *Insurance Law and Practice*, § 249 at 158 (1981).

It is clear that Dr. Guida reasonably discovered or reasonably knew of a change in the condition of his health between May 19, 1992, the date on which he met with Warren, or May 29, 1992, the date upon which the applications were submitted by Warren to Paul Revere, and the dates upon which the policies were respectively issued to him by Paul Revere on July 6, 1992 and July 28, 1992. Accordingly, Dr. Guida's failure to disclose this "change in health" information to Paul Revere, or to Warren, was a material misrepresentation and the policies may therefore be deemed void by Paul Revere on this basis.

Accordingly, the motions for summary judgment by defendants Paul Revere and Warren shall be granted and the cross-motion for summary judgment by plaintiff Dr. Guida shall be denied.

**362**

IT IS therefore on this 30th day of June, 1995, **ORDERED** that the motion for summary judgment by defendant Paul Revere Life Insurance Company is hereby **GRANTED**;

IT IS **FURTHER ORDERED** that the cross-motion for summary judgment by defendant Chester Warren is hereby **GRANTED**; and

IT IS **FURTHER ORDERED** that the cross-motion for summary judgment by plaintiff Dr. Joseph Guida is hereby **DENIED**.