798 A.2d 661 (2002)
351 N.J. Super. 407
FIRST AMERICAN TITLE INSURANCE COMPANY, Plaintiff-Respondent,
v.
Edward LAWSON, Jr., Esquire, Wheeler, Lawson & Snyder, LLP, Adam M. Slater, Jill L. Slater, Kenneth E. Wheeler, Esquire, and Craig J.J. Snyder, Esquire, Defendants-Respondents, and
Summit Bank, K. Hovnanian at Wayne VII, Inc., Lawyers Title Insurance Corporation, Susan O'Neill, William E. Wheeler, Jr. and Michelle J. Wheeler, Defendants.
Lawyers Title Insurance Corporation, Plaintiff-Respondent,
v.
Edward Lawson, Jr., Esquire, Wheeler, Lawson & Snyder, LLP, Kenneth E. Wheeler, Esquire, Craig J.J. Snyder, Esquire, Defendants-Respondents, and
First American Title Insurance Company, Susan O'Neill, William E. Wheeler and Michelle J. Wheeler, Defendants.
Certain Underwriters at Lloyds, London, Plaintiff-Appellant,
v.
Edward Lawson, Jr., Esquire, Kenneth E. Wheeler, Esquire, Craig J.J. Snyder, Esquire and Wheeler, Lawson & Snyder, LLP, Defendants-Respondents. and
K. Hovnanian at Wayne VII, Inc., First American Title Insurance Company and Lawyers Title Insurance Corporation, Interested Parties.
Superior Court of New Jersey, Appellate Division.
Argued May 14, 2002.
Decided June 4, 2002.
*663 Robert F. Priestley and Diane J. O'Neil, Newark, argued the cause for appellant Certain Underwriters At Lloyds, London (Mendes & Mount, attorneys; Mr. Priestley and Ms. O'Neil, of counsel, and on the brief).
Russell M. Finestein, Chatham, argued the cause for respondent Lawyers Title Insurance Corporation (Finestein & Malloy, attorneys; Mr. Finestein and Corrine LaCroix Tighe, on the brief).
Richard L. Plotkin, Morristown, argued the cause for respondent First American Title Insurance Company (Pitney, Hardin, Kipp & Szuch, attorneys; Mr. Plotkin, Maureen C. Pavely and Joseph A. Clark, on the brief).
No other parties have filed a brief.
Before Judges PRESSLER, PARRILLO and FUENTES.
*662 The opinion of the court was delivered by PARRILLO, J.A.D.
Appellant Certain Underwriters at Lloyds, London (Lloyds) brought an action seeking a declaration that the professional liability insurance policy it issued to the law firm of Wheeler, Lawson & Snyder, L.L.P. (law firm) and its individual partners was rescinded or, alternatively, provided no coverage for claims of professional malpractice asserted by two title insurers, First American Title Insurance Company and Lawyers Title Insurance Corporation (collectively, "title insurers") against the law firm and its partners. The trial court denied Lloyd's motion for summary judgment, finding that Lloyds *664 was not entitled, as a matter of law, to rescind its professional liability policy ab initio based upon material misrepresentations in the insurance application; that Lloyds' policy had not been effectively cancelled; and that Lloyds' policy is a policy of primary insurance and does not exclude coverage for claims of negligence against the law firm, as a separate legal entity, and one of its partners, Snyder, both as "innocent insureds." We granted leave to appeal and now reverse. We hold that, under the circumstances, where a partner, acting with authorization and on behalf of his law firm, makes a material misrepresentation on an insurance application, the insurer is entitled to rescission as a matter of law.
The facts are not really in dispute. Edward Lawson, Kenneth Wheeler, and Craig Snyder formed a law partnership and, on August 6, 1997, filed a certificate of registration with the New Jersey Secretary of State for a limited liability partnership, Wheeler, Lawson & Snyder, L.L.P. Wheeler was licensed to practice law in Connecticut and the District of Columbia, but not in New Jersey. Lawson, a New Jersey licensed attorney, and Wheeler, worked at the law firm's principal office in Guttenberg, New Jersey; Snyder, a New York-licensed attorney, worked at the law firm's Manhattan office. Wheeler was the listed registered agent at the partnership's principal address.
The law firm maintained both a business operating account and an attorney trust account, both at Summit Bank. Wheeler, Lawson, and Snyder were all signatories on the business account, but only Wheeler and Lawson were signatories on the law firm's trust account. Essentially, Wheeler was responsible for opening all the bank accounts and for maintaining the books and records of the law firm.
As early as December 1996, Wheeler engaged in the unauthorized practice of law in New Jersey in connection with a number of real estate transactions in the State. Around the same time, Wheeler began misappropriating client trust funds in connection with these real estate closings. Between January and August 1997, Wheeler wrote checks to himself from the law firm's trust accounts totaling at least $5900, and cashed them.
Wheeler's unauthorized practice of law in New Jersey continued through 1998 and into the early part of 1999. For instance, on March 26, 1998, while a partner at the law firm, Wheeler acted as the closing attorney on the refinance of Lawson's condominium in Guttenberg. The closing papers identify him as an attorney-at-law in New Jersey. On April 15, 1998, Wheeler acted as the closing attorney when a law firm client, Joseph Ellis, refinanced his home in Newark. In January 1999, Wheeler acted as the closing attorney for property that Lawson himself was purchasing in Mahwah, New Jersey. Wheeler signed the title closing statement for Lawson and his wife.
At the end of 1997 or beginning of 1998, Lawson discovered Wheeler's misappropriation of client funds, including those of Lawson's mother, Elaine Lawson. When confronted, Wheeler admitted his wrongdoing:
[Wheeler] explained to me what was happening. That we weren't making any money, and his plan was toand I adopted the plan to generate a large sum of money so that we could pay back all the trust accounts, including my mother's, and then we were going to disband the firm.
The two partners then devised a "kiting" scheme whereby monies from one client trust account would be transferred to pay the obligations of another client. *665 Monies were also being transferred from client trust accounts to the law firm's business account to pay expenses of the law firm, including partners' draws. On occasion, Lawson also used client trust account funds, including those of his mother, for his own personal use. By all accounts, Snyder was neither privy, nor a party, to this scheme.
At the same time, on December 4, 1997, Wheeler, on behalf of the law firm, completed an application for professional liability insurance subscribed by Lloyds. The initial application included questions designed to determine whether the prospective insured had any potential or actual malpractice claims expected, threatened or pending against the law firm. The relevant inquiry is set forth below:
After inquiry, is any attorney in your firm aware of:
(a) Any professional liability claims made against the firm or any member of the firm within the past 12 months?
(b) Any acts, error or omissions in professional services that may reasonably be expected to be the basis of a professional liability claim?
(c) Have all claims and/or incidents been reported to CNA?
If "Yes" to either 8a or b, please complete Supplemental Claim Form for each.
Wheeler responded in the negative to subparts (a) and (b) of this question, and left subpart (c) blank.
Thereafter, on April 30, 1998, Wheeler, on behalf of the law firm, also executed an "Acceptance and Warranty Statement," wherein he represented that the statements and information he provided in the application upon which Lloyds may rely were true and accurate. Based on Wheeler's representations in his application and warranty, a policy covering both the law firm and its individual partners was subscribed by Lloyds, effective April 19, 1998 to April 19, 1999. A certificate of insurance, dated May 8, 1998, named the Clerk of the Supreme Court as certificate holder.
The policy issued to the law firm contained an "innocent insured" clause:
Underwriters agrees that such insurance as would otherwise be afforded under this policy shall cover and be paid with respect to those Insureds who did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of (a) one or more of the Acts described in any such exclusion; or (b) such failure to give notice, provided that if the condition be one with which such Insured can comply, after receiving knowledge thereof, the Insured entitled to the benefit of Clause VIII shall comply with such condition promptly after obtaining knowledge of the failure of any other Insured to comply therewith.
The policy also set forth a procedure for cancellation in the event of non-payment of premium:
C. Notice of cancellation by Underwriters shall be mailed or delivered to the Named Insured not more than one hundred twenty (120) days, nor less than sixty (60) days, prior to the effective date. However, if Underwriters cancels this insurance because the Insured has failed to pay a premium when due, this insurance may be canceled by Underwriters by delivering or mailing a written notice of cancellation to the Named Insured at the address shown in the Declarations stating when, not less than ten (10) days thereafter, such cancellation shall be effective. If cancellation is by reason of nonpayment of premium, the notice of cancellation shall state the amount of premium due, the due date *666 and the effect of nonpayment by the due date. Cancellation for nonpayment of premium shall not be effective if payment of the amount due is received by Underwriters prior to the effective date set forth in the notice.
The law firm financed payment of the policy premium through Imperial Premium Finance, Inc. (Imperial), which was authorized to cancel the policy for non-payment of principal. After not having received a premium payment by December 19, 1998, the due date, Imperial purportedly mailed to the law firm a notice of intent to cancel and, when payment was still not made by the extended date, a notice of cancellation. The policy was thereafter reinstated upon both payment of outstanding premium installments and Wheeler's execution of a warranty providing that the he, as signatory principal, was not aware: (1) of any claims being made during past five years against firm or any of its past or present partners; or (2) any circumstances, allegations, or contentions as to any incident that may result in a claim being made against the firm or any of its past or present partners.
Before Wheeler's execution of this warranty, the law firm was notified on or about January 8, 1999 that the Supreme Court's Office of Attorney Ethics (OAE) would be conducting an audit of the law firm's books as a result of three grievances received concerning the firm's handling of real estate transactions. When the law firm failed to produce the necessary records, OAE faxed over to the firm its petition for emergent relief on January 26, 1999 seeking the temporary suspension of Lawson from the practice of law.[1] On that same day, the seller in the Mahwah real estate transaction involving Lawson and his wife filed an order to show cause and verified complaint regarding an outstanding mortgage that Wheeler allegedly failed to pay off at closing. One day earlier, Wheeler had received a verified complaint and order to show cause by a seller in another real estate transaction involving other clients of the law firm. On January 26, in the midst of these events, Wheeler faxed the warrantycertifying that he was not aware of any actual or putative claims against the law firmto Lloyds' agent.
As a result of these and other claims, First American and Lawyers Title, pursuant to obligations under their closing protection letters and title insurance policies, each paid monies to defrauded clients of the law firm because of the misappropriations by Lawson and Wheeler. The title insurers then filed lawsuits against the law firm and its individual partners to recover the monies they expended. These lawsuits were consolidated with Lloyds' declaratory judgment action. Summary judgment motions were filed by both title insurers and by Lloyds. As to the former, the trial court bifurcated the issues of liability and damages pursuant to R. 4:38-2(b), severed the title insurers' claims against defendant Snyder pursuant to R. 4:38-2(a), and disposed of all liability claims in favor of the title insurers and against defendants Lawson, Wheeler, and the law firm. As to the latter, as previously noted, the trial court denied Lloyds' motion for summary judgment, holding that Lloyds was not entitled as a matter of law to rescind its policy as void ab initio based on material misrepresentations in the insurance application; that the policy had not been effectively cancelled; and that, despite the intentional wrongdoing of two of the law firm's three partners, claims against the law firm based *667 on direct and vicarious liability for negligent supervision were not excluded from coverage under Lloyds' policy.[2]
For purposes of this appeal, the trial court, despite finding that the failure to disclose the willful misconduct of a partner[3] constituted a material misrepresentation, nevertheless ruled that Lloyds was not entitled to rescission of its policy. It reasoned thus:
In this case I say equitable relief is inappropriate. I'm going to rule that Lloyd's does not have a right to void the policy ab initio or rescind the policy premised on the misrepresentations, which there were, of Wheeler. There's a complete lack of, in my opinion, due diligence on the part of Lloyd's in getting the type of information.
Basically, the trial court found that rescission was not available because the policy provided only for cancellation as a prospective remedy; because the insurance application was incomplete and Lloyds failed to verify the representations therein, and because the material misrepresentations of one partner do not bind the law firm or other so-called "innocent insureds." We find each of these reasons wanting and hold that under the circumstances Lloyds was entitled to rescission as a matter of law.
On appeal from a trial court's summary judgment determination, we first decide whether there is a genuine issue of material fact. If there is none, as the trial judge properly found in this case, we then decide whether the court's ruling on the law was correct. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); Prudential Property & Casualty Ins. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.1998). On this score, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Manalapan Tp. Committee, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
Rescission voids an insurance policy ab initio. Progressive Cas. Ins. Co. v. Hanna, 316 N.J.Super. 63, 71 n. 10, 719 A.2d 683 (App.Div.1998). It is well-settled that a party seeking rescission based on equitable fraud is required to prove (1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental reliance by the other party. Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619, 624-25, 432 A.2d 521 (1981); Liebling *668 v. Garden State Indem., 337 N.J.Super. 447, 453, 767 A.2d 515 (App.Div.), certif. denied, 169 N.J. 606, 782 A.2d 424 (2001). In other words, an insurer "`may rescind a policy for equitable fraud when the false statements materially affected either the acceptance of the risk or the hazard assumed by the insurer.'" Ledley v. William Penn Life Ins. Co., 138 N.J. 627, 637-38, 651 A.2d 92 (1995) (internal citation omitted) (concerning life insurance). See Booker v. Blackburn, 942 F.Supp. 1005, 1008-09 (D.N.J.1996) ("Under New Jersey law, an insurer may rescind a policy when the insured makes a false statement in the insurance application that materially affects the acceptance of the insurance risk.") (concerning professional liability insurance). See also Gallagher v. New England Mutual Life Ins. Co. of Boston, 19 N.J. 14, 20, 114 A.2d 857 (1955). "In general, a representation by the insured, whether contained in the policy itself or in the application for insurance, will support the forfeiture of the insured's rights under the policy if it is untruthful, material to the particular risk assumed by the insurer, and actually and reasonably relied upon by the insurer in the issuance of the policy." Allstate Ins. Co. v. Meloni, 98 N.J.Super. 154, 158-59, 236 A.2d 402 (App.Div.1967). See Merchants Indem. Corp. of New York v. Eggleston, 68 N.J.Super. 235, 244, 172 A.2d 206 (App. Div.1961), affirmed, 37 N.J. 114, 179 A.2d 505 (1962). In applying the doctrine of equitable fraud to an insured's answers to questions posed in insurance applications, when the question is subjectiveas here where it asks whether the law firm is aware of any circumstances which may result in a claim being made against the firmequitable fraud is present only if the answer was knowingly false. Ledley v. William Penn Life Ins. Co., supra, 138 N.J. at 635-37, 651 A.2d 92; Liebling v. Garden State Indem., supra, 337 N.J.Super. at 454, 767 A.2d 515.
There is no real dispute in this case that, at the time of the law firm's initial application for professional liability insurance on December 4, 1997, Wheeler's negative response to the above-framed question was knowingly false. Wheeler was both engaged in the unauthorized practice of law in New Jersey and misappropriating client trust funds at the time he submitted the insurance application on behalf of the law firm. Nor did he correct the omission and misinformation in the period between submission of the insurance application and actual issuance of the policy on May 6, 1998. See Weir v. City Title Ins. Co., 125 N.J.Super. 23, 29-30, 308 A.2d 357 (App. Div.1973). See also Guida v. Paul Revere Life Ins. Co., 937 F.Supp. 355, 361 (D.N.J. 1995), affirmed, 96 F.3d 1432 (3rd Cir. 1996). Moreover, by the time Wheeler repeated the misrepresentation in his submission of the "Acceptance and Warranty Statement" on April 30, 1998, his only other New Jersey law partner, Lawson, had confronted Wheeler about the misappropriations and, in a blatant cover-up attempt, the two had conspired to engage in a "kiting" scheme. Worse yet, when the misrepresentation was reiterated a third time on the warranty statement upon reinstatement of the cancelled policy on or about February 4, 1999, Lawson himself was misappropriating client monies from his own mother's trust account with the law firm. Considering the obviousness and egregiousness of the attorney misconduct, Wheeler had not answered the question honestly, and we find that no reasonable factfinder could conclude anything other than that Wheeler knew his answer to be false.
Nor is there any question, in our view, that Wheeler's failure to disclose constituted a material misrepresentation, as found *669 by the trial judge himself, and one that was detrimentally relied upon by Lloyds. It seems clear that the very nature of the omission was such as to "naturally and reasonably influence the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium." Massachusetts Mutual Life Ins. Co. v. Manzo, 122 N.J. 104, 115, 584 A.2d 190 (1991) (quoting Kerpchak v. John Hancock Mutual Life Ins. Co., 97 N.J.L. 196, 198, 117 A. 836 (1922)). See Ledley v. William Penn Life Ins. Co., supra, 138 N.J. at 638, 651 A.2d 92; In re Payroll Express Corp., 186 F.3d 196, 207 n. 3 (2nd Cir.1999) (applying New Jersey law), cert. denied sub nom Pereira v. Aetna Casualty & Surety Co., 529 U.S. 1019, 120 S.Ct. 1419, 146 L.Ed.2d 312 (2000); Booker v. Blackburn, supra, 942 F.Supp. at 1011 (applying New Jersey law). It is equally clear that Lloyds would not have subscribed to the policy had Wheeler's criminal and fraudulent activities been known. Under the circumstances, therefore, Lloyds was entitled to rescission of the policy on the grounds of equitable fraud.
Most of the arguments advanced by the title insurers in opposition are lacking in merit and do not warrant full discussion. R. 2:11-3(e)(1)(E). For instance, agreeing with respondents that rescission as an equitable remedy was not available to Lloyds as a matter of law, the trial judge placed significance on the allegation that Lloyds accepted an incomplete application and failed to conduct its own "due diligence" investigation into the insured's qualifications. In so ruling, the trial judge said:
In this case [Wheeler] lied based on his own personal involvement. But who is going to bear the risk of loss? An insurance company that did not engage in due diligence. An insurance company who was content to sit back, accept a form of policy of CNA, a sub part of one question wasn't even answered. That shows the sloppiness.
The trial court was mistaken for a number of reasons. First, the application submitted by Wheeler on December 4, 1997 was not incomplete. Only one question was unanswered and that is because it was rendered moot by Wheeler's responses to the two immediately preceding questions on the application. Those two questions inquired as to the existence of actual and potential claims against the law firm, to which Wheeler's negative response obviated the need to respond further to the third question, which asked whether any such claims had been reported.
As to Lloyds' purported failure of due diligence, it is settled that "[c]ontracts of insurance are contracts of utmost good faith," Gallagher v. New England Mutual Life Ins. Co. of Boston, supra, 19 N.J. at 20, 114 A.2d 857, and "the applicant therefor is bound to deal fairly with the insurer in the disclosure of facts material to the risk." Locicero v. John Hancock Mutual Life Ins. Co., 32 N.J.Super. 300, 306, 108 A.2d 281 (App.Div.1954) (internal citation omitted). Consequently, an insurer's duty to investigate is limited. Ledley v. William Penn Life Ins. Co., supra, 138 N.J. at 639, 651 A.2d 92. Even where an insurer does perform an investigation, however, the applicant's duty to candidly fill out an insurance application is not in any way abated. Our courts have fully recognized this obligation:
[T]he mere fact that an insurer makes an investigation does not absolve the applicant from speaking the truth nor lessen the right of the insurer to rely upon his statements, unless the investigation discloses facts sufficient to expose the falsity of the representations of the applicant or which are of such a nature *670 as to place upon the insurer the duty of further inquiry.
[John Hancock Mutual Life Ins. Co. of Boston v. Cronin, 139 N.J. Eq. 392, 398, 51 A.2d 2 (E. & A.1947).]
Thus, irrespective of the insurer's investigative efforts, when asked a specific question in an insurance application, the insured's obligation is to respond truthfully. Progressive Cas. Ins. Co. v. Hanna, supra, 316 N.J.Super. at 70, 719 A.2d 683. Simply put, "the prospective insured must not misrepresent or conceal information concerning risks entailed in coverage under an insurance policy." Sears Mortgage Corp. v. Rose, 134 N.J. 326, 347, 634 A.2d 74 (1993) (citing Massachusetts Mutual Life Ins. Co. v. Manzo, 122 N.J. 104, 584 A.2d 190 (1991)). Consequently, even if one were to accept the contention that Lloyds was negligent in failing to research the veracity of Wheeler's responses, it is simply not the law that such negligence vitiates a later claim for misrepresentation. See New Castle County v. Hartford Accident & Indem. Co., 685 F.Supp. 1321 (D.Del.1988), aff'd in part, rev'd in part, 933 F.2d 1162 (3rd Cir.1991).
Equally erroneous was the trial court's ruling that the professional liability policy could only be cancelled, not rescinded. On this score, the trial judge noted:
If this policy has been in effect for sixty days or more, which it was, or on or after the effective date if this policy is a renewal, cancellation by Underwriters shall be limited to: Nonpayment of premium, material misrepresentation or nondisclosure to Underwriters of a material fact at the time of the acceptance of the risk.
They are telling the insured in very plain language after our policy due diligence is over and the policy is in effect sixty days or more, cancellation shall be limited to material misrepresentation or nondisclosure to Underwriters of material fact at the time of acceptance of the risk.
....
If an insured is reading this policy, if the policy is in effect sixty days[,] cancellation is limited to material misrepresentation or nondisclosure to Underwriters of material fact. Very easily said, not only do we have a right to cancel, we have right to void. You write the policy, the policy is construed against you. You're in a superior position. Now you want to rely on the equitable relief that is granted in some of the cases under unusual particular circumstances.
As previously noted, rescission voids the insurance policy ab initio. On the other hand, "[c]ancellation voids the policy prospectively but would not affect any claim asserted by an innocent third party prior to cancellation." Progressive Cas. Ins. Co. v. Hanna, supra, 316 N.J.Super. at 71 n. 10, 719 A.2d 683. The trial court's ruling as to the exclusiveness of the remedy of cancellation is based on specific language in the insurance policy prescribing the circumstances under which Lloyds may cancel the policy if in effect for at least sixty days. Yet nowhere does the policy preclude or curtail the insurer's recourse to the equitable remedy of rescission in the face of the insured's fraud. Such a remedy operates as a matter of law, not contract. It lies within the inherent discretion of the court. See Intertech Associates, Inc. v. City of Paterson, 255 N.J.Super. 52, 59, 604 A.2d 628 (App.Div. 1992); Hilton Hotels Corp. v. Piper Co., 214 N.J.Super. 328, 336, 519 A.2d 368 (Ch. Div.1986). Therefore, the absence of a contractual provision expressly providing for this remedy does not preclude a party, aggrieved by the fraud of another, from seeking such relief either at law or in equity.
*671 There is, however, one argument advanced by the title insurers that is worthy of further discussion, namely that Wheeler's knowing material misrepresentation does not bind the law firm on whose behalf the insurance application was made. The trial judge agreed:
Counsel admitted they could have contractually provided for a voiding of the policy based upon material misrepresentation. They did not do so. There are cases that talk about equitable remedies of voiding of policies based on material misrepresentation of fact. Those cases, as I read them, deal with one-on-one or very similar to one-on-one situations where the insured who makes the material misrepresentation is the person who is harmed by the voiding. The insured is punished for the material misrepresentation, not multiple other insured or innocent.
....
[In this case you] have multiple named insureds. None of the cases that were cited to me have dealt with a voiding of a policy as to an innocent insured who did not adopt, who did not participate, who did not ratify, who did not condone the misrepresentation or material misstatement or misstatement of fact or omission of material facts. To do so would harm very innocent people. In a multiple member law firm it could cause a catastrophe. This is apart from the rights of an innocent third party vis-a-vis risk takers.
We disagree. Under the circumstances of this case, the misrepresentations of Wheeler, as agent of the law firm authorized to act on its behalf in the procurement of professional liability insurance, bind the principal, subjecting it to the equitable remedy of rescission.
Here, there is no dispute that, in procuring professional liability insurance for the law firm partnership, Wheeler was acting as an agent of the law firm, in furtherance of partnership business, and with the express authorization of his two co-partners. Indeed, Wheeler's partners specifically authorized him to fill out and submit the insurance application. Clearly, "[i]n an action brought for rescission, an agent's false statements bind his principal if such agent was authorized to speak for the principal in the course of obtaining the particular contract." Equitable Life Assur. Soc. v. New Horizons, Inc., 28 N.J. 307, 314, 146 A.2d 466 (1958) (citing Restatement of Agency § 162). See In re Payroll Express Corp., supra, 186 F.3d at 207 ("In an action for contract rescission, an agent's misrepresentations bind the principal if the agent was authorized to represent the principal in obtaining the contract.") (applying New Jersey law). See also Parker Precision Prods. Co. v. Metropolitan Life Ins. Co., 407 F.2d 1070, 1073 (3d Cir.1969) (applying New Jersey law to find the corporate principal responsible for the material misrepresentations of the corporation's president on an application for life insurance).
This view is entirely consistent with that of the Uniform Partnership Law, N.J.S.A. 42:1-1 to 49, expressly made applicable by R. 1:21-1C to limited liability partnerships for the practice of law, such as the law firm here.[4] That statute, in pertinent part, provides:

*672 1. Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

[N.J.S.A. 42:1-9(1).]
Case law interpreting this provision specifically holds that partners acting within the scope of partnership business bind not only the partnership, but their co-partners as well. See Eule v. Eule Motor Sales, 34 N.J. 537, 542, 170 A.2d 241 (1961) ("[I]t is elementary that each partner is the agent of the other and of the partnership. This common law principle was adopted by the uniform partnership act."). See also Citizens First Nat. Bank v. Bluh, 281 N.J.Super. 86, 97, 656 A.2d 853 (App.Div.1995); Bramblewood v. C & G Assoc., 262 N.J.Super. 96, 101, 619 A.2d 1332 (Law Div.1992); Miller v. McMann, 89 F.Supp.2d 564, 568 (D.N.J.2000).
It is simply no defense that Wheeler's partners may not have authorized him to lie on the application. The fact remains that Wheeler was specifically authorized to fill out and submit the insurance application on behalf of the firm and, in procuring professional liability insurance, certainly he was acting within the scope of his employment.
Further, the fact that the law firm or some of the partners may not have been aware of the misrepresentations is of no consequence. See Equitable Life Assurance Soc'y v. New Horizons, Inc., supra, 28 N.J. at 314, 146 A.2d 466 ("The fact that [the principal] was ignorant of [the agent's] deceptions is of no avail. Innocent material misrepresentations will, in equity, support rescission of an insurance contract. Scienter is not an essential element of equitable fraud."). See also In re Payroll Express Corp., supra, 186 F.3d at 207.
Although rescission is an inherently discretionary remedy, the trial judge in this case acted under a misconception of the applicable law. As such, we need not give the usual deference. We instead must adjudicate the controversy in light of the applicable law in order that a manifest denial of justice be avoided. State v. Steele, 92 N.J.Super. 498, 507, 224 A.2d 132 (App.Div.1966); Kavanaugh v. Quigley, 63 N.J.Super. 153, 158, 164 A.2d 179 (App.Div.1960). Accordingly, we hold that the trial judge erred in withholding the remedy of rescission under these facts, where two of the law firm's three membersand the only ones with signature authority on the firm's New Jersey attorney trust accountsengaged in a course of willful and serious attorney misconduct that the initiating wrongdoer, as agent of the partnership, repeatedly failed to disclose on application documents for professional liability insurance specifically designed to uncover such information. Lloyds was entitled to rescission as a matter of law.
In light of this disposition, we need not decide the remaining issues of whether Lloyds cancelled the policy in compliance with contractual terms and the requirements of the Insurance Premium Finance Company Act, N.J.S.A. 17:16D-1 to -16, or whether the claims of the title insurers against the law firm based on direct liability *673 for negligent supervision come within Lloyds' policy coverage. Suffice it to say, both issues are grounded in the express terms of the professional liability insurance contract that we have found to be void ab initio. Consequently, issues dependent on the existence of that contract need not be now resolved.
Reversed and remanded for entry of judgment consistent with this opinion.
NOTES
[1] Following Lawson's temporary suspension from the practice of law on February 2, 1999, In re Lawson, 157 N.J. 79, 722 A.2d 1288 (1999), he was disbarred as an attorney at law of the State of New Jersey. See In re Lawson, 165 N.J. 201, 755 A.2d 1167 (2000).
[2] Although the trial court certified these orders as final pursuant to R. 4:42-2, we granted leave to appeal since the certification of finality was improvident given that the judgment was not subject to execution. See Tradesoft v. Franklin Mutual Ins. Co., 329 N.J.Super. 137, 140-41, 746 A.2d 1078 (App.Div. 2000).
[3] On this score, the trial court expressly found:

There is no genuine issue as to material fact to preclude the Court from finding that Wheeler's conduct was willful, intentional, may very well constitute criminal misconduct, and his activities were such as to bring him within the prohibitions or the exclusions of Lloyds policy that do not cover acts that rise to that level of misconduct, whether you call them criminal or willful or intentional.
I am satisfied that Wheeler, [who is] not a licensed New Jersey attorney, and in a completely indifferent manner as to his professional responsibilities acted as a New Jersey attorney, dealt with a trust account as if it were his own [fiefdom], and misused clients' funds and the firm's funds for his own personal use or to benefit people he wished to benefit, and that conduct was such as to bring him within the exclusion of Lloyds policy which excludes coverage for certain types of activities, including these activities.
[4] The Uniform Partnership Law, adopted in New Jersey in 1919, was repealed effective December 8, 2000 and replaced by the Uniform Partnership Act of 1996(Act), N.J.S.A. 42:1A-1 to 56. N.J.S.A. 42:1A-56 provides that the Act does not affect any action or proceeding commenced, or any right accrued, before the Act took effect. It is undisputed here that the Uniform Partnership Law governs this matter. In any event, the Act provides a nearly identical provision regarding a partner's role as an agent of the partnership as the Uniform Partnership Law. Compare N.J.S.A. 42:1A-13 with N.J.S.A. 42:1-9.