# RECORD IMPOUNDED

### NOT FOR PUBLICATION WITHOUT THE
### APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4418-16T1

D.A.,

    Plaintiff-Respondent,

v.

C.A.,

    Defendant-Appellant.

_____

        Submitted October 2, 2018 – Decided March 1, 2019

        Before Judges Rothstadt, Gilson and Natali.

        On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FV-02-1673-17.

        Duane Morris LLP, attorneys for appellant (Sarah Fehm Stewart and Melissa S. Geller, on the briefs).

        D.A., respondent pro se.

PER CURIAM

Defendant C.A.[1] appeals from a May 10, 2017 Final Restraining Order (FRO) of the Family Part following a two-day trial. After carefully reviewing the record in light of the arguments raised on appeal, we affirm.

I.

We glean the following facts from the two-day trial on the parties' cross-complaints seeking FROs. The parties were married in September 2012, and they have two children. Plaintiff was a stay-at-home wife and defendant worked as a paralegal. According to plaintiff, defendant "choked" her in September 2013 while she was pregnant with their oldest child. She also testified that in April 2014 defendant shoved her into a wall and in September 2016 "punched [her] in [the] face," causing her to suffer a bruised lip, because a bowl he wanted to use was dirty. At trial, plaintiff introduced photographic evidence of her lip injury from the September 2016 incident. Plaintiff did not report these incidents when they allegedly occurred.

On April 4, 2017, defendant stayed home from work to celebrate his birthday with plaintiff and their children. Defendant stated that as he walked out of the bathroom, plaintiff and their youngest daughter were sitting on the

---

[1] We use the parties' initials to protect their privacy and to maintain the confidentiality of these proceedings.

A-4418-16T1

floor and he saw the child hit plaintiff in the face with the beads of an "amber teething necklace." Defendant further testified that plaintiff, upon being struck by the necklace, smacked their baby "into the desk wall . . . [h]ard enough to knock her into the desk and onto the floor." Defendant asked plaintiff why she hit their daughter and proceeded to pick up the crying baby from the floor.

He also stated that upon picking up the child, a struggle ensued between him and plaintiff over who would hold and comfort the crying baby. During the struggle, according to defendant, "if there was any contact whatsoever, it was incidental or accidental," but he "did not hit [his] wife." Instead, defendant testified "[plaintiff] actually elbowed me in the mouth." Specifically, he stated:

> [s]he essentially tried to . . . go over and under my arms . . . [then] I took about maybe two steps back . . . [and] when she couldn't pull [the baby], she then let go and just elbowed over the top -- elbowed me in the mouth . . . with her right elbow . . . [c]aught the bottom lip. . . [on the] [l]eft side of my face.

Plaintiff presented a divergent narrative of the events that took place on that day. Plaintiff testified that while she was cleaning the home with her children, she sat on the floor to check an e-mail she had received on her phone when defendant told their youngest daughter to strike plaintiff and to say "Fuck you." The child obliged, then apologized, and plaintiff asked defendant

3

why he would tell the baby to do that. According to plaintiff, defendant told her she "was lucky that he didn't hit [her]" and that the child was "just a baby" before instructing the child to repeat her actions.

Plaintiff testified that as she stood up and blocked the child's second strike, defendant "snatched" the child and said to plaintiff, "How could you? How could you hit her into a wall [like that] she's just a baby?" Plaintiff denied hitting the child and stated:

> I then asked, what are you talking about. I didn't hit her. [The child] began to cry hysterically. She then tried to reach for me. And she was saying "Mommy[."] So I reached for her. My husband then said, "Get the fuck away from me." And I said, "Give me the baby. She's upset. She doesn't want to be in your arms right now." He switched arms and said, "Didn't I tell you to leave me the fuck alone?" [The child] then tried to lean further and at that point, she was hanging out of his arms. And I went to grab her and that's when he hit me in my face with his elbow.

Thereafter, according to plaintiff, she "took the girls into the bedroom" and "locked the door" because defendant told her "if [she] reported [the incident] that he was going to kill [her]." At trial, plaintiff introduced photographic evidence of her eye injury.

According to plaintiff, two days after the incident, in the early morning of April 6, 2017, defendant came home, searched the gun safe in their bedroom

4

closet for a gun, and told plaintiff that he wished she and the children were dead. Plaintiff testified that she had disassembled the gun months earlier because defendant threatened to kill her at that time, too. Defendant denied that he searched for the gun that morning and that he told plaintiff he wished she and their children were dead.

Later in the day on April 6, 2017, plaintiff reported the April 4th incident to the Hackensack Police Department, filed a police report claiming defendant assaulted her, and contemporaneously sought a temporary restraining order (TRO), alleging assault, criminal coercion, terroristic threats, and harassment. She also reported defendant's statement earlier that morning wishing that plaintiff and their children were dead. The court granted plaintiff's TRO that afternoon, awarded plaintiff temporary custody of the parties' children, and denied defendant any parenting time or visitation rights. The police executed the TRO that evening and confiscated the handgun.

On April 11, 2017, the Division of Child Protection and Permanency (DCPP) received a referral that the couple's children were neglected, and the DCPP launched an investigation, which the DCPP informed the court of by letter dated May 9, 2017. The letter stated:

> On April 11, 2017, the [DCPP] received a report with concerns of neglect for [the parties' children]. It was

reported that [defendant] coerced the children to hit and say inappropriate language to their mother, [plaintiff]. [Plaintiff] reported that when trying to correct her daughter, [defendant] stated she was lucky he did not hit her, meaning [plaintiff]. [Plaintiff] reported [defendant] eventually struck her in the face which led to bruising and swelling. [Plaintiff] did go to the police and a TRO was granted. [Plaintiff] reported years of abuse financially, mentally and physically. [Plaintiff] has also reported [defendant] threatening to kill her and wishing the children were dead.

The [DCPP] has referred [plaintiff] to services and presently there are no concerns regarding the care she provides to the children.

The [DCPP] has made an attempt to meet with [defendant] by leaving several messages for him to contact a worker. To date, [defendant] has not made himself available to the [DCPP]. The [DCPP] currently does not have any concerns regarding abuse/neglect in regards to [plaintiff]. However, the [DCPP] is concerned in regards to [defendant] as he has not been assessed by the [DCPP] . . . .

Defendant was served with a copy of the TRO and filed a cross-TRO against plaintiff alleging assault and harassment, which the court also granted, prohibiting plaintiff from contacting him. Defendant filed for a divorce in a separate proceeding on May 1, 2017.

Trial on the cross-complaints was conducted on May 9 and 10, 2017. On May 10, 2017, the court dismissed defendant's complaint alleging assault and

6

harassment and denied his request for a FRO. With respect to plaintiff's request for a FRO, the court determined that she failed to establish defendant committed terroristic threats or harassment, but concluded defendant committed two predicate acts of domestic violence -- criminal coercion and assault -- and that there was "a need to protect [plaintiff] from . . . future incidents of domestic violence." This appeal followed.

## II.

Defendant raises three points on appeal. First, he argues that the court's factual findings regarding the second Silver[2] prong were deficient because it failed to address whether a "FRO was necessary to prevent future harm . . . ." Second, he maintains the court relied on "non-credible evidence" in issuing the FRO by ignoring evidence that a divorce proceeding was imminent and because plaintiff was an "incredible witness" whose sole testimony cannot support the FRO. Finally, defendant claims that the provision in the FRO limiting his access to his children violated his constitutional rights. We disagree with defendant's arguments and affirm.

Our scope of review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We owe substantial deference to Family Part judges'

---

[2] Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

findings of fact because of their special expertise in family matters, id. at 413, particularly where the evidence is largely testimonial and rests on the judge's credibility findings. Gnall v.Gnall, 222 N.J. 414, 428 (2015). We will not "disturb the 'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

The Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, accords protection to victims of domestic violence. Before a court may grant a FRO under the PDVA, a party must satisfy the two prongs detailed in Silver, 387 N.J. Super. at 125-26. See N.T.B. v. D.D.B., 442 N.J. Super. 205, 223 (App. Div. 2015). Under the Silver analysis, the trial court must find: (1) "by preponderance of the credible evidence" the defendant committed "one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a)"; and (2) "a restraining order is necessary . . . to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 125-27.

Here, the trial court concluded defendant committed two predicate acts of domestic violence -- criminal coercion and assault. See N.J.S.A. 2C:25-

19(a)(2), (a)(15). Aside from a conclusory statement that he "continues to deny" that he assaulted plaintiff, defendant does not raise any issues with respect to the court's prong one findings.[3] Although an issue not briefed by the parties is typically deemed waived, Liebling v. Garden State Indem., 337 N.J. Super. 447, 465-66 (App. Div. 2001), because our duty "to ensure that victims of domestic violence are protected from abuse" comes with a "concomitant responsibility . . . to ensure that individuals charged with" violating the PDVA receive fair and just treatment, see A.M.C. v. P.B., 447 N.J. Super. 402, 421 (App. Div. 2016), we have reviewed the record and conclude the court's finding that defendant committed the predicate acts of assault and criminal coercion are supported by substantial credible evidence.

"A person is guilty of assault if he [or she]: (1) [a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or (2) [n]egligently causes bodily injury to another with a deadly weapon; or (3) [a]ttempts by physical menace to put another in fear of imminent serious bodily injury." N.J.S.A. 2C:12-1(a). Here, the court concluded defendant committed an assault under N.J.S.A. 2C:12-1(a)(1) based on plaintiff's

---

[3] Defendant's brief makes no challenge at all to the court's finding with respect to the predicate act of criminal coercion.

testimony and photographic evidence of plaintiff's injury documented by the Hackensack Police Department.

As the court stated:

> This [c]ourt has heard the testimony of the parties. This [c]ourt has difficulty from a credibility standpoint accepting the testimony of . . . [defendant] that a string of beads even twice the size of P-4, twice as long, but with beads this size or slightly larger, and the slightly larger is really the issue. This [c]ourt has difficulty saying that the beads of the type, even if in a longer strand on P-4 could, in fact, cause the black eye depicted in the pictures taken by the Hackensack Police Department . . . .
>
> There's no doubt in this [c]ourt's mind that [plaintiff] was struck in the left eye as described in the photos, as described in the police report. And the -- [defendant] gave no testimony that this incident occurred in a mutual scuffle of any type . . . . [H]e claims the injury was caused by, in fact, the beads . . . .
>
> [T]he [c]ourt indicated earlier [N.J.S.A.] 2C[:]12-1(a) assault [sic]. This [c]ourt finds that . . . [defendant] did, in fact, cause bodily injury to [plaintiff] and, in fact, this [c]ourt finds an act of assault [by defendant] did take place.

Based on these findings, it is clear that the court rejected defendant's testimony that a baby swinging miniature beads caused plaintiff to sustain the injury depicted in the photographs, which showed deep bruising to plaintiff's face around her eye. After examining the severity of the injury, the court

10

reasonably concluded plaintiff's injury was caused by defendant's assaultive conduct in elbowing plaintiff in the face, as evidenced by the court's determination that a FRO was necessary to protect plaintiff from similar acts of domestic violence. We also note that, as detailed below, immediately after the assault, defendant threatened "to kill" plaintiff if she reported the incident, an action inconsistent with accidental conduct.

Similarly, the court's findings as to the predicate act of criminal coercion also have sufficient evidentiary support in the record. In August 2015, the Legislature amended the PDVA to include criminal coercion as a stand-alone predicate act of domestic violence. L. 2015, c. 98, § 2; N.J.S.A 2C:25-19(a)(15). "A person is guilty of criminal coercion if, with purpose unlawfully to restrict another's freedom of action to engage or refrain from engaging in conduct, he threatens to: (1) [i]nflict bodily injury on anyone or commit any other offense, regardless of the immediacy of the threat . . . ." N.J.S.A. 2C:13-5(a)(1).

Thus, criminal coercion is comprised of three material elements: (1) a defendant made a proscribed threat, e.g. a threat to inflict "bodily injury," which means "physical pain, illness or any impairment of physical condition," N.J.S.A. 2C:11-1(a); (2) defendant's purpose in making the threat was to

 A-4418-16T1

"restrict another's freedom of action to engage or refrain from engaging in conduct," N.J.S.A. 2C:13-5(a); and (3) "the purpose of the threat [must] be unlawful, not benign." State v. Monti, 260 N.J. Super. 179, 185 (App. Div. 1992). Unlawful purpose does not necessarily mean criminal purpose. Id. at 185-86. Rather, a defendant acts with an unlawful purpose by seeking "to coerce conduct or the refraining from engaging in conduct which defendant has no legal right to require. Efforts to force another to pay a just debt or perform an obligation under a contract are not proscribed by this offense." 33 N.J. Practice, Criminal Law § 10:5, at 358 (Susan B. Gyss) (2018 ed.).

Here, the court's conclusion that defendant committed the predicate act of criminal coercion is amply supported by the record. Specifically, the court credited plaintiff's testimony that defendant threatened he would "kill" plaintiff if she called the police and reported the incident. That conduct satisfies all three elements of the criminal coercion statute. Therefore, we are satisfied that the court correctly concluded plaintiff satisfied the first prong of Silver as to both predicate acts.

As to the second Silver factor, defendant argues the trial court "did not articulate any findings and conclusions at all with respect to (1) whether the parties' previous history required entry of a FRO[;] (2) whether there existed

an immediate danger to plaintiff or to property[;] or (3) the best interests of the parties' children."  We disagree with all of defendant's contentions and conclude the court's findings are amply supported by the record.

The Silver court held that "the guiding standard" under the second prong "is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29a(1) to -29a(6), to protect the victim from an immediate danger or to prevent further abuse."  Silver, 387 N.J. Super. at 127. N.J.S.A. 2C:25-29(a) lists the following six non-exhaustive factors:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
> (2) The existence of immediate danger to person or property;
> (3) The financial circumstances of the plaintiff and defendant;
> (4) The best interests of the victim and any child;
> (5) In determining custody and parenting time the protection of the victim's safety; and
> (6) The existence of a verifiable order of protection from another jurisdiction.

Although all of the factors must be evaluated, the trial court is not required to "incorporate all of those factors into its findings when determining whether or not an act of domestic violence has been committed."  Cesare, 154 N.J. at 401-02; see A.M.C., 447 N.J. Super. at 414 (explaining there are "two key factors" for the trial court to consider "when determining whether to issue

13                                                     A-4418-16T1

permanent restraints: (1) a lack of evidence demonstrating a history of domestic violence or abuse; and (2) the commission of a predicate act that does not involve physical violence against the victim"). Further, the need to issue an FRO based upon an act of domestic violence "may arise . . . where there is 'one sufficiently egregious action[.]'" Silver, 387 N.J. Super. at 128 (alteration in original) (quoting Cesare, 154 N.J. at 402).

With respect to factor one under the second Silver prong, the court stated "[t]here's no doubt -- the [c]ourt would note that P-3 was a series of photos showing a bruised inner lip that [plaintiff] testified was from a previous action of [defendant]," where, according to plaintiff, defendant "punched [her] in [her] face . . . ." After recognizing that history of domestic violence, the court credited plaintiff's testimony and found, as to factor two, "there is a need to protect [plaintiff] from any future danger of domestic violence. And, in fact, there is a need to protect [plaintiff] from a future -- from future incidents of domestic violence."

With respect to the prior history of domestic violence, plaintiff testified that: prior to the April 4, 2017 incident, "[defendant] had threatened to kill me before"; defendant "said he would be at peace if me and the children were dead"; "[i]n September of [2016], [defendant] got upset because the bowl that

he wanted to eat cereal out of was dirty in the dishwasher. So he punched me in my face"; in "April of 2014 . . . [defendant] shoved me into the wall"; and in "September of 2013[,] [when plaintiff] was pregnant with [their] oldest and [defendant] was upset for -- I don't really know why he was upset. He . . . choked me."

Further, the trial court also considered factor three, the parties' financial circumstances, when it stated that "defendant [was] the party who works . . . [and] [t]he plaintiff . . . works inside the home. There [also] was testimony, although unsubstantiated, about the financial situation of the parties." As to the best interests of the children, the PDVA provides that at the FRO hearing, "[t]he court shall presume that the best interests of the child are served by an award of custody to the non-abusive parent." N.J.S.A. 2C:25-29(b)(11). The trial court noted, and based its custody and parenting-time decisions upon, the existence of a contemporaneous DCPP investigation. And with respect to the fifth factor, the court unquestionably considered plaintiff's safety throughout the two-day trial.

Finally, we note the court's findings that defendant committed the predicate acts of assault and criminal coercion were "sufficiently egregious

15

action[s]," independent of each other, to justify a protection order. See Silver, 387 N.J. Super. at 128 (quoting Cesare, 154 N.J. at 402).

## III.

Next, defendant contends the trial court erroneously ignored evidence that a divorce action was imminent in deciding a FRO was necessary to protect plaintiff from future harm. He also argues that the trial court "readily admit[ted] that there were some inconsistencies in [plaintiff's] testimony, but nonetheless found her credible, without explanation," which defendant argues constituted reversible error. We disagree.

That defendant filed for a divorce was a fact in the record, and the court clearly noted the parties' relationship was unstable and referred to their relationship in the past tense by stating "it was a very . . . combustible relationship as was testified by both parties." In addition, the court specifically asked counsel whether plaintiff had been "served with the complaint . . . [for] divorce" by May 10, 2017, so the court clearly did not ignore the fact that divorce proceedings were pending. Further, as noted, the court's finding that a FRO was necessary to protect plaintiff from future harm was amply supported by the record.

16

As to defendant's argument that plaintiff's testimony was too incredible for the trial court to rely upon, it is not the role of an appellate court to "weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence. The test is 'whether the findings made [by the trial court] could reasonably have been reached on sufficient credible evidence present in the record.'" State v. Barone, 147 N.J. 599, 615 (1997) (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

Defendant claims plaintiff's testimony that defendant previously threatened to kill her contradicts the police report, which states plaintiff told the police that defendant said he wished plaintiff and their children were dead but that he did not say "anything like this" before. Defendant also maintains plaintiff's testimony that her eye injury occurred in the morning or afternoon, and before defendant left to get beer and pizza contradicts the police report, which provides that plaintiff "stated that the night the event occurred her husband went to get pizza and beer at the store. He returned and drank two large beers."

We conclude that the trial court did not abuse its discretion when, despite acknowledging "some" inconsistencies between the police report and plaintiff's trial testimony, it found that "in terms of . . . anything substantial . . .

17

there were no inconsistencies that, in fact, would [] cause any issues with" plaintiff's testimony. Plaintiff addressed defendant's arguments regarding inconsistencies with the police report by testifying that the report was inaccurate in the "three instances" that defendant highlights, that the police report statements as to the timing of the events "could be a typo," and that "the police officers did not [write] the information that [she] provided [to] them correctly down" on the police report. We are satisfied that the court's credibility findings are amply supported by the record and are, therefore, entitled to our deference. See State v. Locurto, 157 N.J. 463, 474 (1999) ("Appellate courts should defer to trial courts' credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record.").

IV.

Finally, defendant claims the FRO permanently terminated his visitation rights with respect to his children, which, absent clear and convincing evidence of unfitness or harm to the children, unconstitutionally deprived him of his right to enjoy a relationship with his children. We disagree because defendant's contention misconstrues the terms of the FRO.

18

With respect to visitation, the FRO granted defendant "[n]o parenting time (visitation) until further order," specifically "until the conclusion of [the] investigation [by] DCPP."  It is abundantly clear from the record that the trial court based its temporary parenting-time decision on the fact that there was an active DCPP investigation with which defendant apparently was not complying.  We perceive no abuse of discretion by the trial court in reserving its final decision on visitation pending the resolution of DCPP's investigation.

However we understand from the parties that the DCPP investigation has concluded.  Accordingly, the trial court should, within thirty days of any application filed by defendant, schedule a hearing to address any modification to the custody or parenting time provisions detailed in the FRO under the best interests of the child standard.

To the extent not addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4418-16T1